**Exhibit A**

**Proposed Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| KNOTEL, INC., *et al.*, | Case No. 21-_____ (___) |
| Debtors.[1] | Joint Administration Requested |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POST-PETITION FINANCING, (B) GRANT SENIOR SECURED LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, AND (C) UTILIZE CASH COLLATERAL; (II) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED LENDER; (III) MODIFYING THE AUTOMATIC STAY; (IV) SCHEDULING FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

Upon the motion, dated January 31, 2021 (the "Motion"), of Knotel, Inc. ("Knotel") and its affiliated debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Cases") commenced on January 31, 2021 (the "Petition Date") for interim (this "Interim Order") and final orders under sections 105, 361, 362, 363, 364, 503, 506(c) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), and Rules 2002-1, 4001-1, 4001-2, and 9013-1(f) of the Local Bankruptcy Rules (as amended, the "Local Rules") for the United States Bankruptcy Court for the District of Delaware (this "Court") seeking, among other things,

(a)    authorization for the Debtors, as borrowers (each a "Borrower," and collectively, the "Borrowers"), to obtain postpetition debtor-in-possession financing, comprising a superpriority senior secured multiple-draw term loan facility in an aggregate principal amount of up to $40.8 million (the "DIP Facility"), which consists of (i) a new money multi-draw term loan facility in an aggregate principal

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://www.omniagentsolutions.com/knotel or, alternatively, via the Bankruptcy Court at https://ecf.deb.uscourts.gov/cgi-bin/login.pl with a Public Access to Court Electronic Records ("PACER") account, which may be obtained at https://pacer.uscourts.gov. The location of Debtor Knotel, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 5-9 Union Square West, New York, NY 10003.

amount of $20.4 million (the commitments thereunder, the "New Money DIP Commitments" and the loans advanced thereunder, the "New Money DIP Loans") to be funded by Digiatech, LLC or its designated affiliates (the "DIP Lender") and (ii) a term loan facility in an aggregate principal amount of $20.4 million, which, shall (A) roll-up $20.4 million of the Prepetition Secured Debt (as defined in the DIP Credit Agreement (as defined herein)) on a dollar-for-dollar basis held by the DIP Lender into the DIP Facility (such rolled-up debt, the "Roll-Up Loans" and, together with the New Money DIP Loans, the "DIP Loans"), (B) be issued under the DIP Facility on a *pari passu* basis with the New Money DIP Loans, and (C) be approved in its entirety upon entry of and pursuant to this Interim Order, subject to the Challenge Period (as defined herein) and any such investigation by the Creditors' Committee (as defined herein) pursuant to this Interim Order or final order;

(b)    authorization for the Debtors to enter into that certain *Senior Secured Superpriority Debtor-In-Possession Credit Agreement* among the Borrowers and the DIP Lender (as amended, restated or otherwise modified from time to time in accordance with the terms thereof, the "DIP Credit Agreement," together with all agreements, documents, and instruments delivered or executed in connection therewith, to fund the New Money DIP Commitments, the "DIP Documents"), which shall be in substantially the same form attached hereto as **Exhibit A**, and to perform their respective obligations thereunder and all such other and further acts as may be necessary, appropriate, or desirable in connection with the DIP Documents;

(c)    authorization for the Debtors to use the proceeds of the New Money DIP Loans and the Prepetition Collateral (as defined herein), including Cash Collateral (as defined herein), in accordance with the terms hereof, including pursuant to the Budget (as defined herein) as further described herein, to pay fees and interest under the DIP Facility, to provide working capital for, and for other general corporate purposes of, the Debtors, including for payment of any Adequate Protection Obligations (as defined herein) and to effectuate the Roll-Up Loans;

(d)    to the extent any portion of the Prepetition Secured Debt does not become part of the Roll-Up Loans, the granting of adequate protection to (x) Digiatech, LLC, successor in interest to Western Alliance Bank, as lender (the "Prepetition First Lien Lender") with respect to, among other things, the use of its Cash Collateral and the Prepetition Collateral (as defined herein), arising under that certain Amended and Restated Loan and Security Agreement dated as of February 15, 2019 (as amended, restated, amended and restated, waived, supplemented, or otherwise modified, the "Prepetition First Lien Loan Agreement") among the Debtors, jointly and severally, as Borrower and Prepetition First Lien Lender; and (y) Digiatech, LLC, successor in interest to and assignee of TriplePoint Venture Growth BDC Corp., in its capacity as lender and collateral agent and TriplePoint Capital LLC, as lender (the "Prepetition Second Lien Lender", and together with the Prepetition First Lien Lender, the "Prepetition Secured Lender") under that certain Plain English Growth Capital Loan and Security Agreement dated as of February 27, 2019 (as amended, restated, amended and restated, waived, supplemented, or

otherwise modified, the "<u>Prepetition Second Lien Loan Agreement</u>") among the Debtors, jointly and severally, as Borrower and Prepetition Second Lien Lender:

(e)     authorization for the Debtors to pay, on a final and irrevocable basis, the principal, interest, fees, expenses, and other amounts payable under the DIP Documents as such become earned, due and payable, including, without limitation, the Upfront Fee (as defined herein), and the reasonable fees and disbursements of the DIP Lender's attorneys, advisors, accountants, appraisers, bankers and other consultants, all to the extent provided in, and in accordance with, the DIP Documents;

(f)     the granting of valid, enforceable, non-avoidable and perfected first priority liens on and senior security interests in all of the property, assets and other interests in property and assets of the Debtors that is not subject to a valid and perfected lien on the Petition Date (such property and assets, the "<u>Unencumbered Assets</u>"), whether such property is presently owned or after-acquired, and all other "property of the estate" (within the meaning of the Bankruptcy Code) of the Debtors, of any kind or nature whatsoever, real or personal, tangible, intangible or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date, including, upon entry of the Final Order, the proceeds of and property recovered under any Avoidance Actions (as defined herein), subject only to the Carve Out (as defined herein) on the terms and conditions set forth herein and in the DIP Documents;

(g)     the granting of valid, enforceable, non-avoidable and perfected liens on and junior security interests in all of the property, assets and other interests in property and assets of the Debtors, whether such property is presently owned or after-acquired, and all other "property of the estate" (within the meaning of the Bankruptcy Code) of the Debtors, of any kind or nature whatsoever, real or personal, tangible, intangible or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date, that is subject to valid and perfected security interests in and liens on such property in favor of third parties existing on the Petition Date, excluding the Prepetition Liens, subject only to the Permitted Exceptions (which shall mean (i) a valid, non-avoidable lien that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, or (ii) a valid, non-avoidable lien that was senior to the Prepetition Secured Debt on the Petition Date) and Carve Out (as defined herein) on the terms and conditions set forth herein and in the DIP Documents;

(h)     the granting of superpriority administrative expense claims against each of the Debtors' estates to the DIP Lender, with respect to the DIP Obligations (as defined herein) with priority over any and all administrative expenses of any kind or nature subject and subordinate only to the Carve Out on the terms and conditions set forth herein and in the DIP Documents;

(i)     the waiver of the Debtors' and the estates' right to surcharge against the Prepetition Collateral pursuant to Bankruptcy Code section 506(c), subject to entry of the Final Order (but retroactive to the Petition Date);

(j)     authorization for the DIP Lender to exercise remedies under the DIP Documents on the terms described herein upon the occurrence and during the continuance of an Event of Default (as defined in the DIP Credit Agreement);

(k)     the modification of the automatic stay imposed pursuant to section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of this Interim Order;

(l)     pursuant to Bankruptcy Rule 4001, that an interim hearing (the "Interim Hearing") on the Motion be held before this Court to consider entry of this Interim Order, among other things, (1) authorizing the Borrower, on an interim basis, to borrow from the DIP Lender under the DIP Documents in a single draw up to an aggregate principal amount not to exceed $30.0 million in DIP Loans (subject to any limitations of borrowing under the DIP Documents) (the "Initial DIP Term Loans"), consisting of $15.0 million in New Money DIP Loans and $15.0 million in corresponding Roll-Up Loans, which shall be treated as a roll-up of the Prepetition First Lien Secured Debt, to the extent outstanding, and as to the balance, if any, as a roll-up of the Prepetition Second Lien Secured Debt pursuant to the DIP Documents; (2) upon entry of the Final Order (as defined herein), to borrow from the DIP Lender under the DIP Documents in a single draw up to an aggregate principal amount not to exceed $10.8 million in DIP Loans (subject to any limitations of borrowing under the DIP Documents) (the "Final Loans") consisting of $5.4 million in New Money DIP Loans and $5.4 million in Roll-Up Loans, which shall be treated as a roll-up of the Prepetition First Lien Secured Debt, to the extent outstanding, and as to the balance, if any, as a roll-up of the Prepetition Second Lien Secured Debt, (3) authorizing the Debtors' use of Cash Collateral, and (4) granting the adequate protection described in this Interim Order; and

(m)     that this Court schedule a final hearing (the "Final Hearing") to consider entry of a final order (the "Final Order") authorizing and approving, on a final basis, among other things, the Debtors' borrowing from the DIP Lender under the DIP Documents up to an aggregate principal amount of $40.8 million, consisting of $20.4 million of New Money DIP Loans and $20.4 million of Roll-Up Loans, and the continued use of Cash Collateral and granting adequate protection, in each case, as described in the Motion and set forth in the DIP Documents.

The Court having considered the Motion, the *Declaration of John M. Jureller in Support of First Day Relief* (the "First Day Declaration"), *Declaration of Adam B. Keil in Support of the DIP Financing Motion and Bidding Procedures Motion* (the "Moelis Declaration"), the evidence submitted or proffered and the arguments of counsel made at Interim Hearing; and proper and

sufficient notice of the Motion and the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and 9014; and the Interim Hearing to consider the relief requested in the Motion having been held and concluded; and all objections, if any, to the relief requested in the Motion and to the entry of this Order having been withdrawn, resolved, or overruled by the Court; and it appearing to the Court that granting the relief requested is fair and reasonable and in the best interests of the Debtors, their estates, creditors and parties in interest; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

**IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:**

1.      *Disposition*.  The Motion is GRANTED on an interim basis in accordance with the terms of this Interim Order.  Any objections to the Motion with respect to the entry of this Interim Order that have not been withdrawn, waived, or settled, and all reservation of rights included therein, are hereby denied and overruled.

2.      *Jurisdiction*.  This Court has core jurisdiction over the Cases commenced on the Petition Date, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      *Notice*.  Under the circumstances, the notice given by the Debtors of, and as described in, the Motion, the relief requested therein, and the Interim Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 4001(b) and (c) and the Local Rules, and no further notice of the relief sought at the Interim Hearing and the relief granted herein is necessary or required.

4.      *Debtors' Stipulations*.  Without prejudice to the rights of any other party, but subject to the limitations contained in this Interim Order, the Debtors represent, admit, stipulate, and agree as follows:

(a)      <u>Prepetition Secured Debt</u>.  As of the Petition Date, certain Debtors and non-Debtor

affiliates, without defense, counterclaim, or offset of any kind, were jointly and severally indebted

and liable to the Prepetition Secured Lender under (i) the Prepetition First Lien Loan Agreement

and all other collateral and security documents, instruments, certificates, pledges and other similar

documents executed pursuant thereto or in accordance therewith, in each case as amended,

supplemented, amended and restated or assigned from time to time (collectively, the "<u>Prepetition</u>

<u>First Lien Credit Documents</u>") in the aggregate amount of not less than $18.55 million of

outstanding principal, accrued and unpaid interest, and fees thereon as of the Petition Date,

advanced under the Prepetition First Lien Credit Documents, (the "<u>Prepetition First Lien Secured</u>

<u>Debt</u>"), plus all other fees, costs, expenses, indemnification obligations, charges, premiums, if any,

additional interest, any other "Obligations" (as defined in the Prepetition First Lien Credit

Documents) and all other obligations of whatever nature owing, whether or not contingent,

whenever arising, accrued, accruing, due, owing or chargeable under the Prepetition First Lien

Credit Documents (collectively, including the Prepetition First Lien Secured Debt, the "<u>Prepetition</u>

<u>First Lien Debt Obligations</u>"); and (ii) the Prepetition Second Lien Loan Agreement and all other

collateral and security documents, instruments, certificates, pledges and other similar documents

executed pursuant thereto or in accordance therewith, in each case as amended, supplemented,

amended and restated or assigned from time to time (collectively, the "<u>Prepetition Second Lien</u>

<u>Credit Documents,</u>" and together with the Prepetition First Lien Credit Documents, the

"<u>Prepetition Secured Credit Documents</u>") in the aggregate amount of not less than $51,169,161,

which consists of (x) $50.0 million of outstanding principal advanced under the Prepetition Second

Lien Credit Documents, plus (y) not less than $1,169,161 on account of accrued and unpaid interest

and fees thereon as of the Petition Date ((x) and (y) together plus, subject to the terms of the

Prepetition Second Lien Credit Documents, a $4,375,000 End of Term Payment (as defined in the Prepetition Second Lien Credit Documents), the "Prepetition Second Lien Secured Debt"), plus all other fees, costs, expenses, indemnification obligations, charges, premiums, if any, additional interest, any other "Obligations" (as defined in the Prepetition Second Lien Credit Documents) and all other obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under the Prepetition Second Lien Credit Documents (collectively, including the Prepetition Second Lien Secured Debt, the "Prepetition Second Lien Secured Debt Obligations," and together with the Prepetition First Lien Debt Obligations, the "Prepetition Secured Debt Obligations").

(b)     Prepetition Secured Debt Representations.    The Prepetition Secured Debt Obligations constitute legal, valid, binding and non-avoidable obligations against certain of the Debtors and non-Debtor affiliates and are not subject to any avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.  No payments or transfers made to or for the benefit of (or obligations incurred to or for the benefit of) the Prepetition Secured Lender by or on behalf of any of the Debtors prior to the Petition Date under or in connection with any of the Prepetition Secured Credit Documents is subject to avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.

(c)     Prepetition First Liens.  Pursuant to the Prepetition Secured Credit Documents, the Prepetition Secured Debt Obligations are secured by valid, binding, perfected and enforceable first priority liens on and security interests in (the "Prepetition First Liens") the "Collateral" (as defined

in the Prepetition Secured Credit Documents) (the "Prepetition Collateral"). The Prepetition First Liens (i) are valid, binding, perfected, and enforceable first priority liens and security interests in the Prepetition Collateral, (ii) are not subject, pursuant to the Bankruptcy Code or other applicable law, to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as defined in the Bankruptcy Code) of any kind, (iii) as of the Petition Date are subject and/or subordinate only to the extent permitted by the terms of the Prepetition Secured Credit Documents and (iv) constitute the legal, valid, and binding liens of the Prepetition Secured Lender, enforceable in accordance with the terms of the applicable Prepetition Secured Credit Documents.

(d)    Cash Collateral.    Any and all of the Debtors' cash, including cash and other amounts on deposit or maintained in any account or accounts by the Debtors, and any amounts generated by the collection of accounts receivable or other disposition of the Prepetition Collateral existing as of the Petition Date or from time to time, and the proceeds of any of the foregoing, is the Prepetition Secured Lender's cash collateral within the meaning of Bankruptcy Code section 363(a) (the "Cash Collateral").

5.    *Findings Regarding the DIP Facility and Use of Cash Collateral*

(a)    Good cause has been shown for the entry of this Interim Order.

(b)    As set forth in the First Day Declaration and the Moelis Declaration, the Debtors have an immediate need to obtain the DIP Facility and to use the Cash Collateral in each case on an interim basis, in order to, among other things: (i) permit the orderly continuation of their respective businesses; (ii) maintain business relationships with their vendors, suppliers, customers, and other parties; (iii) make payroll; (iv) make capital expenditures; (v) make adequate protection payments; and (vi) pay the costs of the administration of these chapter 11 cases and satisfy other

working capital and general corporate purposes of the Debtors. The Debtors require immediate access to sufficient working capital and liquidity through the incurrence of the new indebtedness for borrowed money and other financial accommodations to avoid irreparable harm by, among other things, preserving and maintaining the going concern value of the Debtors' business. The Debtors will not have sufficient sources of working capital and financing to operate their business or maintain their properties in the ordinary course of business throughout these chapter 11 cases without the DIP Facility and authorized use of Cash Collateral.

(c)        As set forth in the First Day Declaration and the Moelis Declaration, the Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lender under the DIP Documents and are unable to obtain adequate unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense. Other than with respect to the Unencumbered Assets, the Debtors are unable to obtain secured credit allowable under Bankruptcy Code sections 364(c)(1), 364(c)(2), and 364(c)(3) for the purposes set forth in the DIP Documents without the Debtors granting to the DIP Lender, subject to the Carve Out as provided for herein, the DIP Liens (as defined herein) and the DIP Superpriority Claims (as defined herein) and, subject to the Carve Out, incurring the Adequate Protection Obligations (as defined herein), in each case, under the terms and conditions set forth in this Interim Order and the DIP Documents.

(d)        The terms of the DIP Facility, the DIP Documents and the use of Cash Collateral are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(e)        The DIP Facility has been negotiated in good faith and at arm's length among the Debtors and the DIP Lender, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with the DIP Facility and the DIP Documents including, without

limitation, all loans (including the Roll-Up Loans) made to the Debtors pursuant to the DIP Documents and all other obligations under the DIP Documents (collectively, the "DIP Obligations") shall be deemed to have been extended by the DIP Lender in good faith as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code.  The DIP Obligations, the DIP Liens and the DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified on appeal or otherwise, and any liens or claims granted to the DIP Lender hereunder arising prior to the effective date of any such vacatur, reversal or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

(f)       Subject to the Challenge Period (as defined herein) and any such investigation by the Creditors' Committee pursuant to this Interim Order or final order, the Roll-Up Loans provided for under the DIP Facility are appropriate and the DIP Lender would not be willing to provide the New Money DIP Loans or extend credit to the Debtors thereunder without the inclusions of the Roll-Up Loans within the DIP Facility.

(g)       The Debtors have requested entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Rules.  For the reasons set forth in the Motion, the First Day Declaration and the Moelis Declaration filed in support of the Motion, and the record presented to the Court at the Interim Hearing, absent granting the relief sought by this Interim Order, the Debtors' estates will be immediately and irreparably harmed.  Consummation of the DIP Facility and authorization of the use of the Prepetition Collateral (including the Cash

Collateral) in accordance with this Interim Order and the DIP Documents are therefore in the best interests of the Debtors' estates and are consistent with the Debtors' fiduciary duties.

6.      *Authorization of the DIP Facility and the DIP Documents.*

(a)      The Debtors are hereby expressly authorized and empowered to execute and deliver and, on such execution and delivery, directed to perform under the DIP Documents, including the DIP Credit Agreement, which is hereby approved and incorporated herein by reference.

(b)      Upon entry of this Interim Order, the Debtors are hereby authorized to borrow up to an aggregate principal amount of $15.0 million in New Money DIP Loans and $15.0 million in Roll-Up Loans (plus interest, fees and other expenses and amounts provided for in the DIP Credit Agreement), subject to and in accordance with the Budget.

(c)      Proceeds of the DIP Loans and Cash Collateral shall be used solely for the purposes permitted under the DIP Credit Agreement, this Interim Order and in accordance with the Budget (as defined below) and subject to the Permitted Variance (as defined below), the DIP Documents, and this Interim Order.

(d)      In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized, and the automatic stay imposed by section 362 of the Bankruptcy Code is hereby lifted to the extent necessary and applicable, to perform all acts and to make, execute and deliver all instruments and documents (including, without limitation, the DIP Credit Agreement and any collateral documents contemplated thereby), and to pay all fees, expenses and other amounts contemplated thereby or that may be reasonably required or necessary for the Debtors' performance of their obligations under the DIP Facility including, without limitation:

(i)  the execution, delivery, and performance of the DIP Documents, including, without limitation, the DIP Credit Agreement and any collateral documents contemplated thereby;

(ii)  the Debtors and the DIP Lender are hereby authorized to implement, in accordance with the terms of the DIP Documents, any modifications of the DIP Documents (other than this Interim Order) that are not materially adverse to the Debtors' estate or creditors without further notice, motion, or application to, order of or hearing before, this Court; any materially adverse modification or amendment to the DIP Documents shall only be permitted pursuant to an order of this Court (which may be sought within (3) business days);

(iii)  the non-refundable and, upon entry of this Interim Order, irrevocable payment to the DIP Lender, as applicable, of the fees referred to in the DIP Documents (which fees, in each case, shall be, and shall be deemed to have been, approved upon entry of this Interim Order, and which fees shall not be subject to any challenge, contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise) and any amounts due (or that may become due) in respect of any indemnification obligations under the DIP Documents, including:

- A fully earned, nonrefundable upfront fee in an amount equal to 3.0% of the aggregate principle amounts of the New Money DIP Commitments, which shall be structured as original issue discount against the New Money DIP Loans payable on the date such amount is advanced (the "Upfront Fee"); and

- all reasonable costs and expenses as may be due from time to time under the DIP Documents and this Interim Order, including, without

limitation, fees and expenses of counsel, financial advisors and other professionals retained by the DIP Lender as provided for in the DIP Documents and this Interim Order, subject to the provisions of paragraph 7 hereof;

(iv)     make the payments on account of the Adequate Protection Obligations (as defined herein) provided for in this Interim Order; and

(v)     the performance of all other acts required under or in connection with the DIP Documents.

(e)     Upon execution and delivery of the DIP Credit Agreement and the other DIP Documents, such DIP Documents shall constitute valid, binding, and non-avoidable obligations of the Debtors enforceable against the Debtors in accordance with their respective terms and the terms of this Interim Order for all purposes during these chapter 11 cases, any subsequently converted case of any Debtor to a case under chapter 7 of the Bankruptcy Code, or after the dismissal of any case.  No obligation, payment, transfer, or grant of security under the DIP Credit Agreement, the other DIP Documents or this Interim Order shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable law (including without limitation, under sections 502(d), 548 or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transaction Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim.

7.     *Budget*.

(a)     (a)     Except as otherwise provided herein, the Debtors may only use Cash Collateral and the proceeds of the DIP Facility in accordance with the budget attached hereto as **Exhibit B** (as the same may be updated or amended in accordance with the terms of this Interim Order and the DIP Documents, the "Budget"), which initial Budget attached hereto is satisfactory to the DIP Lender, including without limitation, for: (A) working capital requirements; (B) general corporate purposes; and (C) the costs and expenses (including making payments on account of the Adequate Protection Obligations hereunder and payment of the

allowed fees and expenses of professionals retained by the Debtors' estates) of administering these chapter 11 cases (including payments under the Carve Out as provided herein). The Budget may be amended, updated, replaced, supplemented, or otherwise modified from time to time to the extent such amended, replaced, supplemented or modified Budget is in form and substance satisfactory to the DIP Lender in its sole discretion provided, however, if the updated or amended Budget is not approved by the DIP Lender the most recent Budget satisfactory to the DIP Lender shall remain in effect; provided further that if, at the discretion of the DIP Lender, a contract scheduled to be rejected by the Borrowers is instead assumed, the Budget shall be automatically deemed revised to provide for the payments of amounts associated with the contract so assumed.

(b)     The date on or after the entry of the Interim Order on which the Interim Loans are made available for borrowing under the DIP Facility shall be the "Closing Date"; which shall be no later than two business days after the entry of the Interim Order. On the first Thursday of the second week following the Closing Date, and every Thursday thereafter, the Borrowers shall deliver to (i) the DIP Lender and (ii) Sullivan & Worcester LLP a variance report for the one week period following the Closing Date, and each subsequent one week period ending each week thereafter (each a "Reporting Period"), with the report for each such subsequent one week period setting forth for the one-week period ended on the immediately preceding Friday prior to the delivery thereof, (1) the positive variance (as compared to the DIP Budget) of the aggregate operating disbursements (excluding professional fees) made by the Borrowers in the aggregate for the applicable Reporting Period, and (2) an explanation, in reasonable detail, for any material positive variance (in the case of disbursements), certified by an Authorized Officer of the Borrowers (the "Variance Report"). Without giving effect to the making of the DIP Loans or the repayments or prepayments of the DIP Loans, beginning with the delivery of the initial Variance Report and tested, as of the last day of each applicable Reporting Period, in no event shall (a) the positive variance (as compared to the DIP Budget) of the aggregate operating disbursements (excluding professional fees) made by the Debtors exceed $250,000, and (b) the positive variance of the aggregate operating disbursements made to the Debtors' foreign Subsidiaries exceed 120% of the amount set forth in the DIP Budget for the applicable Reporting Period (in each case, the "Permitted Variance"); provided however any amounts approved for a specific period that are not fully utilized in such period may be used in any succeeding period.

(c)     Subject to the Carve Out, the consent of the DIP Lender to the Budget shall not be construed as consent to the use of any Cash Collateral or DIP Loans after the occurrence of an Event of Default (as defined in the DIP Credit Agreement), regardless of whether the aggregate funds shown on the Budget have been expended.

(d)     The Debtors agree that all amounts disbursed by Lender as New Money DIP Loans shall be held by the Debtors in one or more of Knotel Inc.'s operating accounts maintained with an authorized depository located within the United States. The

Debtors may transfer proceeds of the New Money DIP Loans to the foreign subsidiaries of the Debtors specified in the Budget to fund weekly expenses of such foreign subsidiaries solely to the extent permitted under the Budget. Upon receipt of any notice of Event of Default under the DIP Credit Agreement from Lender, the Debtors agree to immediately cease any such funding of foreign operations absent the written consent of Lender.

8.      *Reporting Requirements/Access to Records*.  The Debtors shall provide the DIP Lender with all reporting and other information required to be provided under the DIP Documents. In addition to, and without limiting, whatever rights to access the DIP Lender has under the DIP Documents, upon reasonable notice, at reasonable times during normal business hours, the Debtors shall permit representatives, agents, and employees of the DIP Lender to: (i) have access to and inspect the Debtors' assets; (ii) examine the Debtors' books and records; and (iii) discuss the Debtors' affairs, finances, and condition with the Debtors' officers and financial advisors.

9.      *DIP Superpriority Claims*.  Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed senior administrative expense claims of the DIP Lender, against each of the Debtors' estates (the "DIP Superpriority Claims"), without the need to file any proof of claim, with priority over any and all administrative expenses, adequate protection claims, diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in Bankruptcy Code sections 503(b) and 507(b), and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for the purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code and which shall be payable from and have recourse to all prepetition and postpetition property of the

15

Debtors and all proceeds thereof, including, upon entry of the Final Order, the proceeds of any claims or causes of action arising under chapter 5 of the Bankruptcy Code (the "Avoidance Actions"), subject only to the payment of the Carve Out to the extent specifically provided for herein.  Except as set forth in, or permitted by, this Interim Order, no other superpriority claims shall be granted or allowed in these chapter 11 cases.

10.    *DIP Liens*.  As security for the DIP Obligations, effective and perfected upon the date of this Interim Order, and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Lender of, or over, any DIP Collateral (as defined herein), the following security interests and liens are hereby granted by the Debtors to the DIP Lender (all property identified in clauses (a) and (b) below and the "Collateral" as defined in the DIP Credit Agreement being collectively referred to as the "DIP Collateral"), subject only to the Permitted Exceptions and payment of the Carve Out, to the extent specifically provided for herein (all such liens and security interests granted to the DIP Lender, pursuant to this Interim Order and the DIP Documents, the "DIP Liens"):

(a)    First Lien on Debtors' Property.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, perfected first priority senior security interest in and lien upon all prepetition and postpetition property of the Debtors, including the Prepetition Collateral, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected and non-avoidable liens (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code), including, without limitation, any unencumbered cash of the Debtors and any investment of such cash, accounts, inventory, goods, contract rights, mineral rights, instruments, documents, chattel paper, patents, trademarks,

copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general

intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit,

intercompany claims, contracts, owned real estate, real property leaseholds, fixtures, deposit

accounts, commercial tort claims, securities accounts, instruments, investment property, letter-of-

credit rights, supporting obligations, vehicles, machinery and equipment, real property, leases (and

proceeds from the disposition thereof), all of the issued and outstanding capital stock of each

Debtor, other equity or ownership interests, including equity interests in subsidiaries and non-

wholly-owned subsidiaries, money, investment property, causes of action (including, upon entry

of the Final Order, the proceeds of Avoidance Actions), and all cash and non-cash proceeds, rents,

products, substitutions, accessions, profits and supporting obligations of any of the collateral

described above, whether in existence on the Petition Date or thereafter created, acquired, or

arising and wherever located.

(b)    Liens Priming the Prepetition Liens.  To the extent necessary, pursuant to section

364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, perfected first priority

senior priming security interest in and lien upon all prepetition and postpetition property of the

Debtors including, without limitation, the Prepetition Collateral, Cash Collateral, and any

investment of such cash, accounts, inventory, goods, contract rights, mineral rights, instruments,

documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts

receivable, receivables and receivables records, general intangibles, payment intangibles, tax or

other refunds, insurance proceeds, letters of credit, intercompany claims, contracts, owned real

estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims, securities

accounts, instruments, investment property, letter-of-credit rights, supporting obligations,

vehicles, machinery and equipment, real property, leases (and proceeds from the disposition

thereof), all of the issued and outstanding capital stock of each Debtor, other equity or ownership interests, including equity interests in subsidiaries and non-wholly-owned subsidiaries, money, investment property, causes of action, and all cash and non-cash proceeds, rents, products, substitutions, accessions, profits and supporting obligations of any of the collateral described above, whether in existence on the Petition Date or thereafter created, acquired, or arising and wherever located, that is subject to any of the Prepetition First Liens securing the Prepetition Secured Debt Obligations.

11.    *Carve Out*.

(a)    <u>Carve Out</u>.  As used in this Interim Order, the "<u>Carve Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim or final order, procedural order, or otherwise, (x) all administrative expenses pursuant to section 503 of the Bankruptcy Code and including (y) all unpaid fees and expenses (including any monthly or success or transaction fee payable to estate professionals) (the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant to section 156, 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") and an official committee of unsecured creditors (the "<u>Creditors' Committee</u>") pursuant to section 328 or 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") at any time before or on the first business day following delivery by the DIP Lender of a Carve Out Trigger Notice (as defined herein), whether allowed by the Court prior to or after delivery of a Carve Out

Trigger Notice; and (iv) allowed administrative expenses including, but not limited to, Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $75,000 incurred after the first business day following the date of delivery by the DIP Lender of the Carve Out Trigger Notice, to the extent allowed, whether by interim or final order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Lender to the Debtors, their lead restructuring counsel, the U.S. Trustee, and lead counsel to the Creditors' Committee providing that a Termination Event (as defined herein) has occurred and stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)    Carve Out Reserves.  On the day on which a Carve Out Trigger Notice is delivered (the "Termination Declaration Date"), the Carve Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees plus the obligations accrued as of the Termination Declaration Date with respect to clauses (i) and (ii) of the definition of Carve Out set forth above.  The Debtors shall deposit and hold such amounts in a segregated account in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to the use of such reserve to pay any other claims.  On the Termination Declaration Date, after funding the Pre-Carve Out Trigger Notice Reserve, the Debtors shall utilize all remaining cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to the use of such reserve to

pay any other claims.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Lender, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all commitments under the DIP Facility have been terminated, in which case any such excess shall be paid to the Prepetition Secured Lender in accordance with its rights and priorities as provided in the Prepetition Secured Credit Documents and this Interim Order.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Lender, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all commitments under the DIP Facility have been terminated, in which case any such excess shall be paid to the Prepetition Secured Lender in accordance with its rights and priorities as provided in the Prepetition Secured Credit Documents and this Interim Order.  Notwithstanding anything to the contrary in the DIP Documents, or this Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph 11, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 11, prior to making any payments to the DIP Lender or the Prepetition Secured Lender, as applicable.  Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, following delivery of a Carve Out Trigger Notice, the DIP Lender shall not sweep or foreclose on cash (including cash received

as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a valid and perfected security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Lender for application in accordance with the DIP Documents and this Interim Order.  Further, notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not increase or reduce the DIP Obligations, or constitute additional DIP Loans (unless, for the avoidance of doubt, additional DIP Loans are used to fund the Carve Out Reserves, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Budget, Carve Out, Post-Carve Out Trigger Notice Cap or the Carve Out Reserves, or any of the foregoing, be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors to the Debtors' Professionals.  For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order, the DIP Facility or in any Prepetition Secured Credit Document, the Permitted Exceptions and Carve Out shall be senior to all liens and claims securing the DIP Facility, the Prepetition First Liens, the Prepetition Secured Debt Obligations and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Secured Debt Obligations.

(c)      <u>Payment of Allowed Professional Fees Prior to the Termination Declaration Date</u>.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(d)      <u>No Direct Obligation to Pay Allowed Professional Fees</u>.  The DIP Lender shall not be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with these chapter 11 cases or any successor cases under any chapter

of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Lender, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(e)  _Payment of Carve Out on or After the Termination Declaration Date_.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out under the DIP Facility shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Documents, the Bankruptcy Code, and applicable law.

12.  _Limitation on Charging Expenses Against Collateral_.  Subject to entry of the Final Order (but retroactive to the Petition Date), no expenses of administration of these chapter 11 cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Prepetition Collateral or the DIP Collateral (except to the extent of the Carve Out), the DIP Lender pursuant to sections 105(a) or 506(c) of the Bankruptcy Code or any similar principle of law or equity, without the prior written consent of the DIP Lender, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender.

13.  _No Marshaling/Application of Proceeds_.  Subject to entry of the Final Order (but retroactive to the Petition Date), the DIP Lender shall be entitled to apply the payments or proceeds of the DIP Collateral and the Prepetition Collateral in accordance with the provisions of the Interim Order or Final Order, as applicable, the DIP Documents and the Prepetition Secured Credit Documents, as applicable, and in no event shall the DIP Lender be subject to the equitable doctrine

of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or Prepetition Collateral.

14.     *Equities of the Case.*  Subject to entry of the Final Order (but retroactive to the Petition Date), (i) the DIP Lender shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and (ii) the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to such parties with respect to the proceeds, products, offspring or profits of any of the Prepetition Collateral or the DIP Collateral, as applicable.

15.     *Use of Cash Collateral*.  The Debtors are hereby authorized to use all Cash Collateral solely in accordance with this Interim Order, the DIP Documents and the Budget including, without limitation, to make payments on account of the Adequate Protection Obligations provided for in this Interim Order, from the date of this Interim Order through and including the date of the Final Hearing.  Except on the terms and conditions of this Interim Order, the Debtors shall be enjoined and prohibited from at any time using the Cash Collateral.

16.     *Adequate Protection for the Prepetition Secured Lender.*  To the extent any portion of the Prepetition Secured Debt does not become part of the Roll-Up Loans and subject only to the Carve Out and the terms of this Interim Order, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, and in consideration of the stipulations and consents set forth herein, as adequate protection of its interests in the Prepetition Collateral (including Cash Collateral), for and equal in amount to the aggregate postpetition diminution in value of such interests (each such diminution, a "Diminution in Value"), resulting from the imposition of the priming DIP Liens on the Prepetition Collateral, the Carve Out, the Debtors' sale, lease or use of the Prepetition Collateral (including Cash Collateral), the imposition of the automatic stay, and/or any other reason for which adequate protection may be granted under the Bankruptcy Code, the Prepetition

Secured Lender is hereby granted the following (collectively, the "Adequate Protection Obligations"):

(a)        Adequate Protection Liens.  As security for and solely to the extent of any Diminution in Value, additional and replacement valid, binding, enforceable non-avoidable, and effective and automatically perfected postpetition security interests in, and liens on, as of the date of this Interim Order (the "Adequate Protection Liens"), without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, all DIP Collateral. Subject to the terms of this Interim Order, the Adequate Protection Liens shall be subordinate only to the (A) Carve Out and (B) the DIP Liens.  Subject to the Challenge Period (as defined herein) and any such investigation by the Creditors' Committee pursuant to this Interim Order or final order, the Adequate Protection Liens shall otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral (including, for the avoidance of doubt, any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code).

(b)        Adequate Protection Superpriority Claim.  As further adequate protection, and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code, an allowed administrative expense claim in the chapter 11 cases to the extent of any postpetition Diminution in Value ahead of and senior to any and all other administrative expense claims in such Cases, except the Carve Out and the DIP Superpriority Claims (the "Adequate Protection Superpriority Claim").  The Adequate Protection Superpriority Claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof.  Subject to the Carve Out and the DIP Superpriority Claims in all respects, the Adequate Protection Superpriority

Claim will not be junior to any claims and shall have priority over all administrative expense claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(d), 726, 1113 and 1114 Bankruptcy Code. The Prepetition Secured Lender shall not receive or retain any payments, property or other amounts in respect of the Adequate Protection Superpriority Claims under section 507(b) of the Bankruptcy Code granted hereunder unless and until the DIP Obligations have been indefeasibly paid in full, in cash, or satisfied in a manner otherwise agreed to by the DIP Lender, in each case as provided in the DIP Documents.

(c)     Fees and Expenses. As further adequate protection, the Debtors are authorized and directed to pay, without further Court order, reasonable and documented fees and expenses (the "Adequate Protection Fees"), whether incurred before or after the Petition Date, of the Prepetition Secured Lender, including, without limitation, the reasonable and documented fees and expenses of (a) Sullivan & Worcester LLP, counsel to the Prepetition Secured Lender, and (b) any other professional retained by the Prepetition Secured Lender for services rendered regarding the Prepetition Secured Debt. The invoices for such fees and expenses shall not be required to comply with any particular format, may be in summary form only, and may include redactions. The applicable professional shall serve copies of the invoices supporting the Adequate Protection Fees on counsel to the Debtors, the U.S. Trustee and counsel to the Creditors' Committee (if any), and any Adequate Protection Fees shall be subject to prior ten day review by the Debtors, the U.S. Trustee and the Creditors' Committee (if any), and in the event the Debtors, the U.S. Trustee or the Creditors' Committee shall file with this Court an objection to any such legal invoice, the

portion of such legal invoice subject to such objection shall not be paid until resolution of such objection by this Court.  If no objection is filed within such ten-day review period, such invoice shall be paid without further order of the Court within five days following the expiration of the foregoing review period and shall not be subject to any further review, challenge, or disgorgement. For the avoidance doubt, the provision of such invoices shall not constitute a waiver of attorney-client privilege or any benefits of the attorney work product doctrine.

(d)  Accrued Adequate Protection Payments.  As further adequate protection, the Prepetition Secured Lender, shall receive, upon entry of this Interim Order, monthly adequate protection payments (the "Accrued Adequate Protection Payments") payable in kind on the thirtieth day of each month equal to the interest at the then applicable interest rate under the Prepetition Secured Credit Documents that would otherwise be owed to the Prepetition Secured Lender under the Prepetition Secured Credit Documents, during such monthly period in respect of the Prepetition Secured Obligations that are not Roll-Up Loans, until such time as the full Prepetition Secured Debt is paid in full, in cash.

17.  *Section 507(b) Reservation*.  Nothing herein shall impair or modify the application of Bankruptcy Code section 507(b) in the event that the adequate protection provided to the Prepetition Secured Lender is insufficient to compensate for any Diminution in Value of their interests in the Prepetition Collateral during the chapter 11 cases.  Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by the Prepetition Secured Lender that the adequate protection granted herein does in fact adequately protect the Prepetition Secured Lender against any diminution in value of their interest in the Prepetition Collateral (including the Cash Collateral).

18.    *Restrictions on Disposition of Material Assets Outside the Ordinary Course of Business.*  Except as expressly permitted under the "first day" pleadings or the DIP Documents, the Debtors shall not use, sell or lease any material assets outside the ordinary course of business, or seek authority of this Court to the extent required by section 363 of the Bankruptcy Code, without obtaining the prior written consent of the DIP Lender at least five days (or such shorter period as the DIP Lender may agree) prior to the date on which the Debtors seek the Court's authority for such use, sale, or lease.  Except as otherwise provided under the DIP Documents, subject to the Carve Out, in the event of any such sale, lease, transfer, license, or other disposition of property of the Debtors that constitutes DIP Collateral outside the ordinary course of business (to the extent permitted by the DIP Documents and this Interim Order), the Debtors are authorized and shall promptly pay, without further notice or order of this Court, the DIP Lender 100% of the net cash proceeds, less reasonable fees and expenses, resulting therefrom no later than the third business day following receipt of such proceeds.   Except as otherwise provided under the DIP Documents, subject to the Carve Out, in the event of any casualty, condemnation, or similar event with respect to property that constitutes DIP Collateral, the Debtors are authorized and shall promptly pay to the DIP Lender any insurance proceeds, condemnation award, or similar payment (excluding any amounts on account of any D&O policies) no later than the second business day following receipt of payment by the Debtors, unless the DIP Lender consents, in its sole discretion, in writing, to the funds being reinvested by the Debtors.

19.    *Insurance.*  At all times the Debtors shall maintain casualty and loss insurance coverage for the Prepetition Collateral and the DIP Collateral on substantially the same basis as maintained prior to the Petition Date.

20.    *Reservation of Rights of the DIP Lender and Prepetition Secured Lender*.  To the extent any portion of the Prepetition Secured Debt does not become part of the Roll-Up Loans, notwithstanding any other provision in this Interim Order to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair: (a) any rights of the Prepetition Secured Lender to seek any other or supplemental relief in respect of the Debtors including the right to seek additional adequate protection; <u>provided</u> that any such further or different adequate protection shall at all times be subordinate and junior to the claims and liens of the DIP Lender granted under this Interim Order and the DIP Documents; (b) any of the rights of  the DIP Lender, or the Prepetition Secured Lender under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right of the DIP Lender, or the Prepetition Secured Lender to (i) request modification of the automatic stay of Bankruptcy Code section 362, (ii) request dismissal of any of the chapter 11 cases, conversion of any of the chapter 11 cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers in any of the chapter 11 cases, (iii) seek to propose, subject to the provisions of Bankruptcy Code section 1121, a chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of the DIP Lender, or the Prepetition Secured Lender.  The delay in or failure of the DIP Lender and/or the Prepetition Secured Lender to seek relief or otherwise exercise their  rights and remedies shall not constitute a waiver of any of the DIP Lender's or such Prepetition Secured Lender's rights and remedies.

21.    *Termination Event*.  Subject to paragraph 11, the Debtors' authorization to use Cash Collateral and the proceeds of the DIP Facility pursuant to this Interim Order shall automatically terminate, and the DIP Obligations shall become due and payable, without further notice or action by the Court following the earliest to occur of any of the following (each a "<u>Termination Event</u>"):

(a) the occurrence of an Event of Default (as defined in the DIP Credit Agreement), which are explicitly incorporated by reference into this Interim Order; (b) the Debtors' failure to (i) comply with any provision of this Interim Order, (ii) comply with any other covenant or agreement specified in this Interim Order or the DIP Credit Agreement (which covenants and agreements are explicitly incorporated by reference into this Interim Order), or (iii) comply with any of the Milestones (as defined in, and as set forth in, the DIP Credit Agreement); or (c) the occurrence of the Maturity Date (as defined in the DIP Credit Agreement).

22.     *Remedies Upon a Termination Event.*  The Debtors shall immediately provide notice to counsel to the DIP Lender, and a copy to counsel to the Creditors' Committee (if any), of the occurrence of any Termination Event, at which time the Debtors' ability to use Cash Collateral hereunder shall terminate (subject to the proviso at the end of this paragraph 22) and the DIP Obligations shall become due and payable.  Upon the occurrence of a Termination Event and following the giving of not less than three business days' advance written notice, which may be by email (the "Enforcement Notice"), to counsel to the Debtors, the U.S. Trustee, and counsel to the Creditors' Committee (if any) (the "Notice Period"), the DIP Lender may exercise any rights and remedies against the DIP Collateral available to it under this Interim Order, the DIP Documents, and applicable non-bankruptcy law, including but not limited to terminating all commitments to extend credit under the DIP Facility.  The only permissible basis for the Debtors, the Creditors' Committee (if any), or any other party to contest, challenge or object to an Enforcement Notice shall be solely with respect to the validity of the Termination Event(s) giving rise to such Enforcement Notice (*i.e.*, whether such Termination Event validly occurred and has not been cured or waived in accordance with this Interim Order).  The automatic stay pursuant to Bankruptcy Code section 362 shall be automatically terminated with respect to the DIP Lender,

and the Prepetition Secured Lender at the end of the Notice Period, without further notice or order of the Court, unless the DIP Lender and the Prepetition Secured Lender elect otherwise in a written notice to the Debtors, which may be by email. Upon termination of the automatic stay, the DIP Lender and the Prepetition Secured Lender shall be permitted to exercise all rights and remedies set forth herein, in the DIP Documents, and the Prepetition Secured Credit Documents, as applicable, and as otherwise available at law against the DIP Collateral and/or Prepetition Collateral, without any further order of or application or motion to the Court, and without restriction or restraint imposed by any stay under Bankruptcy Code sections 362 or 105, or otherwise, against (x) the enforcement of the liens and security interests in the DIP Collateral or the Prepetition Collateral, or (y) the pursuit of any other rights and remedies granted to the DIP Lender, or the Prepetition Secured Lender pursuant to the DIP Documents, the Prepetition Secured Credit Documents, or this Interim Order; provided that during the Notice Period the Debtors may use the proceeds of the DIP Facility (to the extent drawn prior to the occurrence of a Termination Event) or Cash Collateral only to (i) fund operations in accordance with the DIP Credit Agreement and the Budget, subject to the Permitted Variance, and (ii) to fund the Carve Out Reserves; provided further that during the Notice Period the Debtors and the DIP Lender consent to a hearing on an expedited basis to consider whether a Termination Event has occurred; provided further, that if a hearing to consider the foregoing is requested to be heard before the end of the Notice Period but is scheduled for a later date by the Court, the Notice Period shall be automatically extended to the date of such hearing, but in no event later than five business days after delivery of the Enforcement Notice; provided further that any fees and expenses incurred by the Debtors or the Committee during the Notice Period shall permanently reduce the Post-Carve Out Trigger Notice Cap.

23.     *No Waiver for Failure to Seek Relief.*  The failure or delay of the DIP Lender to exercise rights and remedies under this Interim Order, the DIP Documents, the Prepetition Secured Credit Documents, or applicable law, as the case may be, shall not constitute a waiver of their respective rights hereunder, thereunder or otherwise.

24.     *Perfection of the DIP Liens and Adequate Protection Liens.*

(a)     Subject to the limitations in this Interim Order, in its respective capacities, the DIP Lender and the Prepetition Secured Lender are hereby authorized, but not required, to file or record (and to execute in the name of the Debtors, as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, intellectual property filings, mortgages, depository account control agreements, notices of lien, or similar instruments in any jurisdiction in order to validate and perfect the liens and security interests granted hereunder. Whether or not, in its respective capacities, the DIP Lender or the Prepetition Secured Lender shall, each in its sole discretion, choose to file such financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination (subject to the priorities set forth in this Interim Order), at the time and on the date of entry of this Interim Order.  Upon the request of, in its respective capacities, the DIP Lender or the Prepetition Secured Lender, as applicable, the Debtors, without any further consent of any party, are authorized to take, execute, deliver, and file such instruments (in each case, without representation or warranty of any kind) to enable the DIP Lender or the Prepetition Secured Lender to further validate, perfect, preserve, and enforce the DIP Liens and the applicable Adequate Protection Liens, respectively.  All such documents will be deemed to have been recorded and filed as of the Petition Date.

(b)     A certified copy of this Interim Order may, in the discretion of the DIP Lender or the Prepetition Secured Lender, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording; provided, however, that notwithstanding the date of any such filing, the date of such perfection shall be the date of this Interim Order.

(c)     Effective upon entry of the Final Order, any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code.  Thereupon, any such provision shall have no force and effect with respect to the granting of the DIP Liens and the Adequate Protection Liens on such leasehold interest or the proceeds of any assignment, and/or sale thereof by any Debtor in accordance with the terms of the DIP Credit Agreement or this Interim Order.

25.     *Preservation of Rights Granted Under this Interim Order.*

(a)     Subject to the Carve Out, other than as set forth in this Interim Order, neither the DIP Liens nor the Adequate Protection Liens shall be made subject to or *pari passu* with any lien or security interest granted in any of the chapter 11 cases or arising after the Petition Date, and neither the DIP Liens nor the Adequate Protection Liens shall be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code.

(b)　　In the event this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise, any liens or claims granted to the Prepetition Secured Lender hereunder arising prior to the effective date of any such vacatur, reversal, or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges, and benefits granted herein, and the Prepetition Secured Lender shall be entitled to the protections afforded in section 363(m) of the Bankruptcy Code with respect to all uses of the Prepetition Collateral (including the Cash Collateral) and all Adequate Protection Obligations.

(c)　　Subject to the Carve Out, unless and until all DIP Obligations, Prepetition Secured Debt Obligations and Adequate Protection Obligations are indefeasibly paid in full, in cash, and all commitments to extend credit under the DIP Facility are terminated, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly (i) except as permitted under the DIP Documents and with the prior written consent of the DIP Lender (x) any modification, stay, vacatur, or amendment of this Interim Order, (y) a priority claim for any administrative expense, secured claim or unsecured claim against any of the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in sections 503(b), 507(a) or 507(b) of the Bankruptcy Code) in any of the chapter 11 cases, equal or superior to the DIP Superpriority Claims, the Adequate Protection Superpriority Claims, the Prepetition Secured Debt Obligations (or the liens and security interests securing such claims and obligations), or (z) any other order allowing use of the DIP Collateral; (ii) except as permitted under the DIP Documents, any lien on any of the DIP Collateral or the Prepetition Collateral with priority equal or superior to the DIP Liens, the Adequate Protection Liens, or the Prepetition Liens, as the case may be; (iii) the use of Cash

33

Collateral for any purpose other than as permitted in the DIP Documents and this Interim Order; (iv) except as set forth in the DIP Documents, the return of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any prepetition indebtedness) to any creditor of any Debtor; (v) an order converting or dismissing any of the chapter 11 cases; (vi) an order appointing a chapter 11 trustee in any of the chapter 11 cases; or (vii) an order appointing an examiner with enlarged powers in any of the chapter 11 cases.

(d)     Notwithstanding any order dismissing any of the chapter 11 cases under section 1112 of the Bankruptcy Code or otherwise entered at any time, (x) the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claims, and the other administrative claims granted pursuant to this Interim Order, shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and Adequate Protection Obligations are indefeasibly paid in full, in cash (and such DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, Adequate Protection Superpriority Claims, and the other administrative claims granted pursuant to this Interim Order, shall, notwithstanding such dismissal, remain binding on all parties in interest); and (y) the Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (x) above.

(e)     Except as expressly provided in this Interim Order or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claims, and all other rights and remedies of the DIP Lender, and to the extent any portion of the Prepetition Secured Debt does not become part of the Roll-Up Loans, the Prepetition Secured Lender, granted by the provisions of this Interim Order and the DIP Documents shall survive, shall maintain their priority as provided in this Interim Order, and shall not be modified,

impaired or discharged by (i) the entry of an order converting any of the chapter 11 cases to a case under chapter 7, dismissing any of the chapter 11 cases, terminating the joint administration of these chapter 11 cases or by any other act or omission, (ii) the entry of an order approving the sale of any Prepetition Collateral or DIP Collateral pursuant to section 363(b) of the Bankruptcy Code or (iii) the entry of an order confirming a plan of reorganization in any of the chapter 11 cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations.  The terms and provisions of this Interim Order and the DIP Documents shall continue in these chapter 11 cases, in any successor cases if these cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code.  The DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens and Adequate Protection Superpriority Claims and all other rights and remedies of the DIP Lender and the Prepetition Secured Lender granted by the provisions of this Interim Order shall continue in full force and effect until the DIP Obligations and the Adequate Protection Obligations are indefeasibly paid in full, in cash (or, with respect to the DIP Obligations, otherwise satisfied in a manner agreed to by the DIP Lender).

26.     *Expenses and Indemnification.*

(a)     All (i) reasonable and documented out-of-pocket fees and expenses incurred by professionals or consultants retained by the DIP Lender, (collectively, the "DIP Professionals"), incurred in connection with the chapter 11 cases (in any capacity) and the DIP Facility, whether or not the DIP Facility is successfully consummated, and (ii) reasonable and documented out-of-pocket expenses (including, without limitation, fees, disbursements and other charges of DIP Professionals) of the DIP Lender, for enforcement costs and documentary taxes associated with the DIP Facility and the transactions contemplated thereby, are to be paid by the Debtors.  All fees

and expenses described above shall be payable by the Debtors (whether accrued or incurred prior to, on, or after the Petition Date) within ten calendar days after the delivery of invoices (which invoices shall not be required to comply with any particular format and may be in summary form only and may be in redacted form to protect privileged and confidential information) to the Debtors, the U.S. Trustee, and the Creditors' Committee (if any), without the necessity of filing motions or fee applications and such fees and expenses shall not be subject to any further review, challenge, or disgorgement following the expiration of such period.

(b)    As set forth in the DIP Facility, the Debtors will, jointly and severally, indemnify the DIP Lender, and its respective affiliates, successors and assigns and the officers, directors, employees, agents, advisors, controlling persons, and members of each of the foregoing (each an "Indemnified Person"), and hold them harmless from and against any and all losses, claims, damages, costs, expenses (including but not limited to reasonable and documented legal fees and expenses), and liabilities arising out of or relating to the execution or delivery of the DIP Credit Agreement and other DIP Documents, transactions contemplated hereby and thereby, and any actual or proposed use of the proceeds of any loans made under the DIP Facility in accordance with the terms of the DIP Credit Agreement; provided that no such person will be indemnified for costs, expenses, or liabilities to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred solely by reason of the actual fraud, gross negligence, or willful misconduct of such person (or their related persons).  No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the Debtors or any shareholders or creditors of the Debtors for or in connection with the transactions contemplated hereby, except to the extent such liability is found in an final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified

Person's actual fraud, gross negligence or willful misconduct, and in no event shall any Indemnified Person be liable on any theory of liability for any special, indirect, consequential, or punitive damages.

27.     *Limitation on Use of DIP Facility Proceeds, DIP Collateral, and Cash Collateral.* Notwithstanding anything to the contrary set forth in this Interim Order, none of the DIP Facility, the DIP Collateral, the Prepetition Collateral or the proceeds thereof, including Cash Collateral, or the Carve Out may be used: (a) to investigate (except as expressly provided herein), initiate, prosecute, join, or finance the initiation or prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, or other litigation of any type (i) against the DIP Lender or the Prepetition Secured Lender (each in its capacities as such) or seeking relief that would impair the rights and remedies of the DIP Lender or the Prepetition Secured Parties (each in its  capacities as such) under the DIP Documents, the Prepetition Secured Credit Documents, or this Interim Order, including, without limitation, for the payment of any services rendered by the professionals retained by the Debtors or any Creditors' Committee in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense, or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration, or similar relief that would impair the ability of the DIP Lender or the Prepetition Secured Lender (each in its capacities as such) to recover on the DIP Collateral or the Prepetition Collateral or seeking affirmative relief against the DIP Lender or the Prepetition Secured Lender (each in its capacity as such) related to the DIP Obligations, or the Prepetition Secured Debt Obligations, (ii) seeking to invalidate, set aside, avoid, or subordinate, in whole or in part, the DIP Obligations or the DIP Lender's liens or security interests in the DIP Collateral, the Prepetition Secured Debt

Obligations or the Prepetition Liens, or (iii) for monetary, injunctive, or other affirmative relief against the DIP Lender or the Prepetition Secured Lender (each in its capacities as such), or their respective liens on or security interests in the DIP Collateral or the Prepetition Collateral that would impair the ability of the DIP Lender or the Prepetition Secured Lender (each in its capacity as such) to assert or enforce any lien, claim, right, or security interest or to realize or recover on the DIP Obligations or the Prepetition Secured Debt Obligations; (b) for objecting to or challenging in any way the legality, validity, priority, perfection, or enforceability of the claims, liens, or interests (including the Prepetition Liens) held by or on behalf of the Prepetition Secured Lender related to the Prepetition Secured Debt Obligations, or by or on behalf of the DIP Lender related to the DIP Obligations; (c) for asserting, commencing, or prosecuting any claims or causes of action whatsoever, including, without limitation, any Avoidance Actions (as defined herein) related to the DIP Obligations, the DIP Liens, the Prepetition Secured Debt Obligations, or the Prepetition Liens; (d) for prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of: (x) any of the DIP Liens or any other rights or interests of the DIP Lender related to the DIP Obligations or the DIP Liens, or (y) any of the Prepetition Liens or any other rights or interests of the Prepetition Secured Lender related to the Prepetition Secured Debt Obligations or the Prepetition Liens; provided that (i) no more than $25,000 of the proceeds of the DIP Facility, the DIP Collateral, or the Prepetition Collateral, including the Cash Collateral, in the aggregate, may be used by the Creditors' Committee, if appointed, solely to investigate the foregoing matters with respect to the Prepetition Secured Debt Obligations, the Roll-Up Loans, and the Prepetition Liens within the Challenge Period (as defined herein); and (ii) no more than $25,000 of the proceeds of the DIP Facility, the DIP Collateral, or the Prepetition Collateral, including the Cash Collateral, in the

aggregate, may be used by the Creditors' Committee, if appointed, solely to investigate the any claims or causes of action against non-Debtor affiliates within the Challenge Period.

28. *Effect of Stipulations on Third Parties.*

(a) The Debtors' acknowledgments, stipulations, admissions, waivers, and releases set forth in this Interim Order shall be binding on the Debtors, their estates, and their respective representatives, successors, and assigns upon entry of this Interim Order. The acknowledgments, stipulations, admissions, waivers, and releases contained in this Interim Order shall also be binding upon and all other parties in interest, including the Creditors' Committee (if any), or any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors (a "Trustee"), unless (a) such party with requisite standing, has duly filed an adversary proceeding challenging the validity, perfection, priority, extent, or enforceability of the Prepetition Liens, or the Prepetition Secured Debt Obligations, or otherwise asserting or prosecuting any Avoidance Actions or any other claims, counterclaims or causes of action, objections, contests, or defenses (collectively, the "Claims and Defenses") against the Prepetition Secured Lender in connection with any matter related to the Prepetition Collateral, the Prepetition Liens or the Prepetition Secured Debt Obligations by no later than (i) with respect to any Creditors' Committee, the date that is 60 days after the Creditors' Committee's formation, or such earlier date provided that a sale of substantially all of the Debtors' assets is approved in fewer than 60 days or (ii) with respect to other parties in interest, no later than the date that is 75 days after the entry of this Interim Order, or such earlier date provided that a sale of substantially all of the Debtors' assets is approved in fewer than 60 days (the time period established by the later of the foregoing clauses (i) and (ii), the "Challenge Period"); provided that in the event that, prior to the expiration of the Challenge Period, (x) these chapter 11 cases are converted to chapter 7 or (y) a chapter 11 trustee is appointed in these chapter

11 cases, then, in each such case, the Challenge Period shall be extended for a period of 60 days solely with respect to any Trustee, commencing on the occurrence of either of the events described in the foregoing clauses (x) and (y); and (b) an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the plaintiff sustaining any such challenge or claim in any such duly filed adversary proceeding.  If no such adversary proceeding is timely filed prior to the expiration of the Challenge Period, without further order of this Court: (x) the Prepetition Secured Debt Obligations shall constitute allowed claims, not subject to any Claims and Defenses (whether characterized as a counterclaim, setoff, subordination, recharacterization, defense, avoidance, contest, attack, objection, recoupment, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined by section 101(5) of the Bankruptcy Code), impairment, subordination (whether equitable, contractual or otherwise), or other challenge of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law), for all purposes in these Cases and any subsequent chapter 7 cases, if any; (y) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected and of the priority specified in paragraphs 4(b) and 4(d), not subject to setoff, subordination, defense, avoidance, impairment, disallowance, recharacterization, reduction, recoupment, or recovery; and (z) the Prepetition Secured Debt Obligations, the Prepetition Liens on the Prepetition Collateral and the Prepetition Secured Lender shall not be subject to any other or further challenge and any party in interest shall be forever enjoined and barred from seeking to exercise the rights of the Debtors' estates or taking any such action, including any successor thereto (including any estate representative or a Trustee, whether such Trustee is appointed or elected prior to or following the expiration of the Challenge Period).  If any such adversary proceeding is timely filed prior to the expiration of the Challenge Period, (a) the stipulations and admissions contained in this Interim

Order shall nonetheless remain binding and preclusive on the Creditors' Committee (if any) and any other party in these cases, including any Trustee, except as to any stipulations or admissions that are specifically and expressly challenged in such adversary proceeding and (b) any Claims and Defenses not brought in such adversary proceeding shall be forever barred; _provided_ that, if and to the extent any challenges to a particular stipulation or admission are withdrawn, denied or overruled by a final non-appealable order, such stipulation also shall be binding on the Debtors' estates and all parties in interest.

(b)    Nothing in this Interim Order vests or confers on any person (as defined in the Bankruptcy Code), including any Creditors' Committee, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, any challenge with respect to the Prepetition Secured Credit Documents or the Prepetition Secured Debt Obligations.

29.    _Release_.  Subject to the rights and limitations set forth in paragraphs 29 and 30 of this Interim Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of each of their predecessors, their successors, and assigns shall to the maximum extent permitted by applicable law, unconditionally, irrevocably and fully forever release, remise, acquit, relinquish, irrevocably waive and discharge the DIP Lender, the Prepetition Secured Lender, and each of their respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest, each in their capacity as such, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or

judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description that exist on the date hereof with respect to or relating to the DIP Obligations, the DIP Liens, the Prepetition Secured Debt Obligations or the Prepetition Liens, as applicable, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection or avoidability of the liens or claims of the DIP Lender, and the Prepetition Secured Lender; provided, that nothing in this paragraph 29 shall in any way limit or release the obligations of any DIP Lender under the DIP Documents.

30.     *Credit Bidding*.  (a) The DIP Lender shall have the unqualified right to credit bid up to the full amount of any DIP Obligations in the sale of any of the Debtors' assets, including pursuant to (i) section 363 of the Bankruptcy Code, (ii) a plan of reorganization or a plan of liquidation under section 1129 of the Bankruptcy Code, or (iii) a sale or disposition by a chapter 7 trustee for any Debtor under section 725 of the Bankruptcy Code, and (b) to the extent any portion of the Prepetition Secured Debt does not become part of the Roll-Up Loans, subject to the indefeasible payment in full in cash of the DIP Obligations, the Prepetition Secured Lender shall have the right to credit bid (x) up to the full amount of the Prepetition Secured Debt Obligations, (y) the Adequate Protection Obligations and (z) any unpaid Accrued Adequate Protection Payments, as applicable, in the sale of any of the Debtors' assets, including, but not limited to, pursuant to (i) section 363 of the Bankruptcy Code, (ii) a plan of reorganization or a plan of liquidation under section 1129 of the Bankruptcy Code, or (iii) a sale or disposition by a chapter 7

trustee for any Debtor under section 725 of the Bankruptcy Code. The DIP Lender shall have the absolute right to assign, sell, or otherwise dispose of its right to credit bid in connection with any credit bid by or on behalf of it or any acquisition entity or joint venture formed in connection with such bid.

31. *Interim Order Governs.* In the event of any inconsistency between the provisions of this Interim Order or the DIP Documents, the provisions of this Interim Order shall govern.

32. *Binding Effect; Successors and Assigns.* The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these chapter 11 cases, including without limitation, the DIP Lender and the Prepetition Secured Lender (each in its capacity as such), any Creditors' Committee appointed in these chapter 11 cases, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Lender and the Prepetition Secured Lender (each in its capacity as such), provided that, except to the extent expressly set forth in this Interim Order, the Prepetition Secured Lender shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.

33. *Limitation of Liability.* In determining to make any loan under the DIP Documents, permitting the use of Cash Collateral, or exercising any rights or remedies as and when permitted pursuant to this Interim Order, the DIP Documents, or the Prepetition Secured Credit Documents, the DIP Lender and the Prepetition Secured Lender shall not be deemed to be in control of the

operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors or their respective business (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 *et seq.* as amended, or any similar federal or state statute), nor shall they owe any fiduciary duty to any of the Debtors, their creditors or estates, or constitute or be deemed to constitute a joint venture or partnership with any of the Debtors. Furthermore, nothing in this Interim Order, the DIP Documents or the Prepetition Secured Credit Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender or the Prepetition Secured Lender of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in section 101(2) of the Bankruptcy Code).

34.    *Effectiveness*.  This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

35.    *Final Hearing*.  The Final Hearing is scheduled for _____, 2021 at _____, prevailing Eastern time, before this Court.  The Debtors shall promptly transmit copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing, to any party that has filed a request for notices with this Court and to any Creditors' Committee after the same has been appointed, or Creditors' Committee counsel, if the same shall have been appointed.  Any party-in-

interest objecting to the relief sought at the Final Hearing shall serve and file a written objection thereto, which shall be served upon the Debtors' counsel, the counsel to the DIP Lender and Prepetition Secured Lender, the Office of the United States Trustee, and each party that has filed a request for notice in these cases, and shall also be filed with the Clerk of the United States Bankruptcy Court for the District of Delaware, in each case to allow actual receipt by the foregoing no later than _____, 2021 at _____, prevailing Eastern time.

Dated: _____, 2021

_____
UNITED STATES BANKRUPTCY JUDGE

## Exhibit A

**DIP Credit Agreement**

# SENIOR SECURED SUPERPRIORITY
# DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This **SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT** dated as of January ___, 2021 (as amended, restated, supplemented or otherwise modified from time to time, this "Agreement"), by and among KNOTEL, INC., a Delaware corporation ("Parent Borrower"), each of Parent Borrower's subsidiaries signatories hereto (each a "Subsidiary Borrower" and together with the Parent Borrower, each a "Borrower" and collectively the "Borrowers" or the "Debtors") and DIGIATECH, LLC, a Delaware limited liability company, as lender (together with its successors and assigns, "Lender").

## W I T N E S S E T H :

A.      The Borrowers are indebted to Lender under (i) that certain Amended and Restated Loan and Security Agreement dated as of February 15, 2019 (the "Prepetition First Lien Loan Agreement"), among the Borrowers, jointly and severally, as borrowers, and Lender, as successor in interest to Western Alliance Bank, as lender, in the aggregate principal amount of $18,547,478 (plus any interest, fees and other charges due to Lender under the related loan and security documents, the "Prepetition First Lien Secured Debt"), and (ii) that certain Plain English Growth Capital Loan and Security Agreement dated as of February 27, 2019 (the "Prepetition Second Lien Loan Agreement"), among the Borrowers, jointly and severally, as borrowers, and Lender, as successor in interest to TriplePoint Venture Growth BDC Corp. and TriplePoint Capital LLC, as lenders and Digiatech, LLC, successor in interest to TriplePoint Venture Growth BDC Corp. as collateral agent, in the aggregate principal amount of $50,000,000, (plus any interest, fees and other charges due to Lender under the related loan and security documents, the "Prepetition Second Lien Secured Debt", and collectively with the First Lien Prepetition Secured Debt, the "Prepetition Secured Debt").

B.      The Prepetition Secured Debt is secured by fully-perfected, first and second priority liens, respectively (collectively, the "Prepetition Liens") on substantially all assets of the Borrowers, including, among other things, a pledge of the Borrowers' equity interests in their non-debtor Subsidiaries (the "Prepetition Collateral").

C.      On January [____], 2021 (the "Petition Date") each of the Borrowers filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") and the Borrowers have retained possession of their assets and are authorized under the Bankruptcy Code to continue the operation of their businesses as debtors-in-possession.

D.      In connection with the Chapter 11 Cases (defined below), the Borrowers have requested that Lender provide them with a debtor-in-possession credit facility (the "DIP Facility") in an aggregate principal amount not to exceed $40,800,000 (the "Commitment"), consisting of a $20,400,000 million fully committed, multi-draw term loan (the "New Money DIP Facility", and the loans made thereunder, the "New Money DIP Loans") and $20,400,000 in roll-up term loans (the "Roll-Up Loans", and together with the New Money DIP Loans, the "DIP Loans") to provide funding to cover the costs, including operating expenses and professional fees of the Chapter 11 Cases and ultimately a sale of substantially all of the Borrowers' assets under section 363 of the

Bankruptcy Code (the "Asset Sale").

E.       All of the Borrowers' obligations under the DIP Loans are to be secured, pursuant to sections 364(d)(1) and 364(c) of the Bankruptcy Code, as applicable, by valid and enforceable, first priority (other than Permitted Exceptions (as defined herein)), fully-perfected security interests in and liens (the "DIP Liens") on all assets, real and personal property rights, and interests of the Borrowers including, without limitation, the property described on Exhibit A attached hereto (the "Collateral"), including without limitation, any and all causes of action, and specifically including, after entry of a Final Order (as defined herein) any proceeds and property recovered in respect of the Borrowers' claims and causes of action arising under Bankruptcy Code sections 544, 545, 547, 548 and 550 or any other similar state or federal law (the "Avoidance Action Proceeds"), subject only to the Carve-Out (as defined herein) for the payment reasonable professional fees and expenses of the Borrowers and Lender and Permitted Exceptions.

F.       Lender is willing to extend such credit to the Borrowers, on a post-petition basis, and provide the DIP Facility on the terms and subject to the conditions herein set forth.

G.       This Agreement and the rights and obligations of Lender and the Borrowers hereunder shall be subject to the entry of the Interim Order (as defined herein), and ultimately, the entry of the Final Order (as defined herein).

NOW, THEREFORE, in consideration of the mutual covenants and undertakings contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

DEFINITIONS

**Section 1.01   Definitions**.   Wherever used in this Agreement, the Exhibits or the Schedules attached hereto, unless the context otherwise requires, the following terms have the following meanings:

"Accrued Adequate Protection Payments" has the meaning given to it in the DIP Order.

"Additional Amounts" has the meaning given to it in Section 2.04(a).

"Adequate Protection Liens" has the meaning given to it in the DIP Order.

"Affiliate" means, with respect to any Person, any other Person (a) that owns, directly or indirectly, in the aggregate more than 10% of the beneficial ownership interest of such Person; (b) that directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, such Person; or (c) that directly or indirectly is a general partner, controlling shareholder, or managing member of such Person.

"Agreement" has the meaning given to it in the introductory paragraph hereto.

"Agreement Date" means the date of this Agreement.

"Asset Sale" has the meaning given to it in the Recitals hereto.

"<u>Avoidance Action Proceeds</u>" has the meaning given to it in the Recitals hereto.

"<u>Bankruptcy Code</u>" means title 11 of the United States Code, as now and hereafter in effect, or any successor statutes.

"<u>Bankruptcy Court</u>" has the meaning given to it in the Recitals hereto.

"<u>Borrowers</u>" has the meaning given to it in the introductory paragraph hereto.

"<u>Business Day</u>" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed.

"<u>Carve-Out</u>" has the meaning given to it in the DIP Order.

"<u>Chapter 11 Cases</u>" means the Chapter 11 cases of the Debtors administered under the Bankruptcy Code and pending in the Bankruptcy Court.

"<u>Closing Date</u>" means the date on or after the entry of the Interim Order on which the Interim DIP Loans are made available for borrowing under Section 2.02(b) hereof, which shall be no later than two (2) Business Days after the entry of the Interim Order.

"<u>Collateral</u>" has the meaning given to it in the Recitals hereto.

"<u>Commitment</u>" has the meaning given to it in the Recitals hereto.

"<u>Connection Income Taxes</u>" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"<u>COVID-19 Pandemic</u>" means the COVID-19 pandemic and the economic, financial, business, operational and healthcare effects thereof and the response of governmental and healthcare authorities with respect thereto.

"<u>Debtors</u>" has the meaning given to it in the introductory paragraph hereto.

"<u>Default</u>" means any event which, at the giving of notice, lapse of time or fulfillment of any other condition (or any combination of the foregoing), would constitute an Event of Default.

"<u>Default Rate</u>" has the meaning given to it in Section 2.07.

"<u>DIP Budget</u>" shall mean (i) the budget attached hereto as <u>Schedule 3</u> and (ii) the most recent supplement to such budget, and all intervening supplements to such budget, delivered in accordance with Section 6.01(e) as approved by Lender in its sole discretion; <u>provided</u>, that no such supplements to such forecast under clause (ii) above shall become the DIP Budget unless Lender in its sole discretion approves such supplement to such budget becoming the DIP Budget (and to the extent that such supplement to such forecast is not approved, the DIP Budget that is then in effect shall continue to constitute the DIP Budget for all purposes of this Agreement), in each case, detailing the Borrowers' weekly cash flow forecasts on a rolling 13-week basis, in form

and substance satisfactory to Lender in its sole discretion; provided further that if, at the discretion of the Lender, a contract scheduled to be rejected by the Borrowers is instead assumed, the DIP Budget shall be automatically deemed revised to provide for the payments of amounts associated with the contract so assumed.

"DIP Liens" has the meaning given to it in the Recitals hereto.

"DIP Loans" has the meaning given to it in the Recitals hereto.

"DIP Order" means the Interim Order or Final Order, as applicable.

"DIP Superpriority Claim" has the meaning given to it in the DIP Order.

"Dollars" and the "$" sign mean the lawful currency of the United States of America.

"Eligible Assignee" means a commercial bank, insurance company, or company engaged in the business of making commercial loans or a commercial finance company or any Affiliate of Lender.

"Event of Default" has the meaning given to it in Section 7.01.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Lender or required to be withheld or deducted from a payment to a Lender, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Lender being organized under the laws of, having its principal office, or having its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a DIP Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the DIP Loan or Commitment or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.04, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Lender's failure to comply with Section 2.04(c) and (d) any withholding Taxes imposed under FATCA.

"Final Order" means the final order entered by the Bankruptcy Court which, among other things, approves this Agreement and is otherwise in form and substance reasonably satisfactory to Lender in its sole discretion, as the same may be amended, modified or supplemented from time to time with the consent of the Lender.

"GAAP" means generally accepted accounting principles consistently applied as set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the accounting profession).

"<u>Government Authority</u>" means any government, quasi-governmental agency, governmental department, ministry, cabinet, commission, board, bureau, agency, court, tribunal, regulatory authority, instrumentality, judicial, legislative, fiscal, or administrative body or entity, whether domestic or foreign, federal, state, provincial or local, having jurisdiction over the matter or matters and Person or Persons in question.

"<u>Indebtedness</u>" means the following:

(a)      all indebtedness for borrowed money;

(b)      the deferred purchase price of assets or services (other than trade payables and other liabilities to employees and officers arising in the ordinary course of business and not related to any financing) which in accordance with GAAP would be shown to be a liability (or on the liability side of a balance sheet);

(c)      the maximum amount of all letters of credit issued or acceptance facilities established for the account of the Borrowers, including without duplication, all drafts drawn thereunder (other than letters of credit or acceptance facilities supporting other indebtedness of the Borrowers which are otherwise permitted hereunder);

(d)      all capitalized lease obligations;

(e)      all indebtedness of another Person secured by any Lien on any property of Borrowers, whether or not such indebtedness has been assumed or is recourse (with the amount thereof, in the case of any such indebtedness that has not been assumed by the Borrowers, being measured as the lower of (x) the fair market value of such property and (y) the amount of the indebtedness secured); and

(f)      indebtedness created or arising under any conditional sale or title retention agreement.

"<u>Indemnified Taxes</u>" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under the DIP Loans and (b) to the extent not otherwise described in (a), Other Taxes.

"<u>Indemnity</u>" has the meaning given to it in Section 8.15.

"<u>Interest Rate</u>" means 12.0% per annum, computed on the basis of a year of 360 days and payable for the actual number of days elapsed (including the first day but excluding the last day).

"<u>Interim DIP Loans</u>" has the meaning given to it in 2.02(b).

"<u>Interim Order</u>" means the interim order entered by the Bankruptcy Court, which, among other things, approves this Agreement on an interim basis and the Interim DIP Loans and is otherwise in form and substance reasonably satisfactory to Lender in its sole discretion.

"<u>Intellectual Property</u>" means (a) all patents, patent applications, patent disclosures and inventions (whether patentable or unpatentable and whether or not reduced to practice), (b) all

trademarks, service marks, trade dress, trade names, slogans, logos, and corporate names and Internet domain names, together with all of the goodwill associated with each of the foregoing, (c) copyrights, copyrightable works, and licenses, (d) registrations and applications for registration for any of the foregoing, (e) computer software, data, databases, and documentation thereof, (f) trade secrets and other confidential information, (g) other intellectual property, and (h) copies and tangible embodiments of the foregoing (in whatever form and medium).

"JUUL Settlement" means any proceeds received by the Borrowers in connection with the settlement of outstanding claims against Juul Labs, Inc.

"Lender" has the meaning given to it in the introductory paragraph hereto.

"Lien" means any lien, pledge, preferential arrangement, mortgage, security interest, deed of trust, charge, assignment, hypothecation, title retention, privilege or other encumbrance on or with respect to property or interest in property having the practical effect of constituting a security interest, in each case with respect to the payment of any obligation with or from the proceeds of, any asset or revenue of any kind.

"Material Adverse Effect" means a material adverse effect on (a) the business, operations, condition (financial or otherwise) or assets of the Borrowers, taken as a whole, other than (i) as a result of those customarily would occur leading up to the commencement of the Chapter 11 Cases, (ii) the actions expressly required to be taken pursuant to this Agreement, or the DIP Order, and (iii) the COVID-19 Pandemic, and (b) the validity or enforceability of any provision of this Agreement, (c) the ability of any Borrower to fully and timely perform the Obligations, or (d) the rights and remedies of Lender under this Agreement.

"Maturity Date has the meaning given to it in 2.03.

"Necessary Documents" has the meaning given to it in 4.01(h).

"New Money DIP Loans" has the meaning given to it in the Recitals hereto.

"New Money DIP Facility" has the meaning given to it in the Recitals hereto.

"Obligations" means, without duplication, (a) all Indebtedness evidenced hereunder, (b) fees payable hereunder, and (c) all other obligations and liabilities (monetary or otherwise, whether absolute or contingent, matured or unmatured) of the Borrowers to Lender, in each case now existing or hereafter incurred under, arising out of or in connection with this Agreement, the Interim Order or the Final Order, and to the extent that any of the foregoing includes or refers to the payment of amounts deemed or constituting interest, only so much thereof as shall have accrued, been earned and which remains unpaid at each relevant time of determination.

"Organizational Documents" means the articles of organization or incorporation, by-laws, or equivalent documents, each as amended to date of each of the Borrowers.

"Other Connection Taxes" means, with respect to any Lender, Taxes imposed as a result of a present or former connection between such Lender and the jurisdiction imposing such Tax (other than connections arising from such Lender having executed, delivered, become a party to,

performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced the DIP Loan, or sold or assigned an interest in any DIP Loan.

"Other Taxes" means any and all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes or any other excise or property Taxes arising from any payment made hereunder or from the execution, delivery, registration or enforcement of, or otherwise with respect to this Agreement (excluding, for greater certainty, any taxes on the general income of Lender.)

"Parent Borrower" has the meaning given to it in the introductory paragraph hereto.

"Patriot Act" has the meaning given to it in Section 8.06.

"Permitted Indebtedness" means the Obligations, the Prepetition Secured Debt, intercompany debt as provided for in the DIP Budget, and the debt set forth on Schedule 2.

"Permitted Exceptions" means (i) a valid, non-avoidable lien that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code or (ii) a valid, non-avoidable lien that was senior to the Prepetition Secured Debt on the Petition Date.

"Permitted Variance" has the meaning assigned to it in Section 6.01(e).

"Person" means and includes any natural person, individual, partnership, joint venture, corporation, trust, limited liability company, limited company, joint stock company, unincorporated organization, government entity or any political subdivision or agency thereof, or any other entity.

"Petition Date" has the meaning given to it in the Recitals hereto.

"Prepetition First Lien Secured Debt" has the meaning given to it in the Recitals hereto.

"Prepetition Liens" means (i) Liens granted under the Prepetition Secured Debt and (ii) a valid, non-avoidable lien that was senior to the Prepetition Secured Debt on the Petition Date.

"Prepetition Second Lien Secured Debt" has the meaning given to it in the Recitals hereto.

"Prepetition Secured Debt" has the meaning given to it in the Recitals hereto.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors (including attorneys, accountants and experts) of such Person and such Person's Affiliates.

"Reporting Period" has the meaning given to it in Section 6.01(e).

"Responsible Officer" means, as to any Person, the chief executive officer, the chief restructuring officer, the chief operating officer, the President, any Financial Officer or any Vice

President of such Person. Unless otherwise specified, all references to a Responsible Officer herein shall mean a Responsible Officer of the applicable Borrower.

"Roll-Up Loans" has the meaning given to it in the Recitals hereto.

"Subsidiary or Subsidiaries" means, as to any Person, any entity of which securities or other ownership interests having ordinary voting power to elect a majority of the board of directors or other persons performing similar functions are at the time directly or indirectly owned by such Person.

"Subsidiary Borrower" has the meaning given to it in the introductory paragraph hereto.

"Taxes" means all present or future taxes, levies, imposts, stamp or other duties, fees, assessments, deductions, withholdings, and other charges imposed by any Government Authority, and all liabilities with respect thereto, together with any interest, fees, additions to tax or penalties applicable thereto (including by reason of any delay in payment).

"Tax Returns" has the meaning given to it in Section 4.01(k).

"Upfront Fee" has the meaning given to it in Section 2.08.

"Variance Report" has the meaning given to it in Section 6.01(e).

**Section 1.02   Interpretation**.  In this Agreement, unless the context otherwise requires, all words and personal pronouns relating thereto shall be read and construed as the number and gender of the party or parties requires and the verb shall be read and construed as agreeing with the required word and pronoun; the division of this Agreement into Articles and Sections and the use of headings and captions is for convenience of reference only and shall not modify or affect the interpretation or construction of this Agreement or any of its provisions; the words "herein," "hereof," "hereunder," "hereinafter" and "hereto" and words of similar import refer to this Agreement as a whole and not to any particular Article or Section hereof; the words "include," "including," and derivations thereof shall be deemed to have the phrase "without limitation" attached thereto unless otherwise expressly stated; references to a specified Article, Exhibit, Section or Schedule shall be construed as a reference to that specified Article, Exhibit, Section or Schedule of this Agreement.  The Borrowers and Lender agree that any reference contained herein to the Interim Order or the Final Order shall include all terms, conditions and provisions of such order and that the terms of such order are incorporated herein for all purposes.  In the event of a conflict between this Agreement and the Final Order, the Final Order shall govern.

**Section 1.03   Business Day Adjustment**.  If the day by which a payment is due to be made is not a Business Day, that payment shall be made by the next succeeding Business Day unless that next succeeding Business Day falls in a different calendar month, in which case that payment shall be made by the Business Day immediately preceding the day by which such payment is due to be made.

**Section 1.04   Definition of "Knowledge."**  For purposes of this Agreement, whenever a representation or warranty is made to the Borrowers' knowledge or awareness, to the "best of" the

Borrowers' knowledge, or with a similar qualification, knowledge or awareness means the actual knowledge of each of the individuals set forth on Schedule 5.

## ARTICLE II
## THE DIP LOANS

**Section 2.01    Use of Proceeds**.  The proceeds of the New Money DIP Loans shall be used in accordance with the DIP Budget (subject to the Permitted Variance) to provide working capital for the funding to cover costs, including operating expenses and professional fees, of the Chapter 11 Cases, including the Asset Sale, including but not limited to payroll, payment of insurance premiums, and payment of the costs and expenses of administering the Chapter 11 Cases.  For the avoidance of doubt, the approved use of proceeds includes the payment of reasonable professional fees for services performed by (i) Milbank LLP, counsel for the Debtors, (ii) Morris Nichols Arsht & Tunnell LLP, local counsel for the Debtors (iii) Moelis & Company LLC, financial advisor for the Debtors, (iii) Fenwick & West LLP as corporate counsel, (iv) Omni Agent Solutions, claims and noticing agent for the Debtors, (v) Sullivan & Worcester LLP, counsel to the DIP Lender, and (vi) Greenberg Traurig, LLP, Delaware counsel to the DIP Lender, together with other professional advisors for the DIP Lender, as needed.

**Section 2.02    The DIP Loans**.

(a)    <u>The Commitment</u>.  Lender agrees to fund a secured multi-draw DIP Facility in an amount not to exceed $40,800,000, consisting of $20,400,000 million in New Money DIP Loans and $20,400,000 in Roll-Up Loans, to be funded in accordance with the schedule set forth below.  The New Money DIP Loans and the Roll-Up Loans shall be issued under the DIP Facility on a *pari passu* basis.

(b)    <u>Interim DIP Loans</u>.  Upon entry of the Interim Order and subject to the conditions in <u>Section 5</u>, effective on the Closing Date, (i) the Borrowers shall be entitled to make an initial draw of New Money DIP Loans in the principal amount of up to $15,000,000 which amount shall be used in accordance with the DIP Budget, and (ii) Lender shall be entitled to refinance into and have constitute DIP Loans hereunder the outstanding principal balance of and interest and fees accrued, on a dollar for dollar basis, an amount equal to $15,000,000 in Prepetition Secured Debt which shall be allocated, as between Lender's Prepetition First Lien Secured Debt and Lender's Prepetition Second Lien Secured Debt as set forth in Section 2.02(d) below (such amounts, collectively, the "<u>Interim DIP Loans</u>").

(c)    <u>Final DIP Loans</u>.  Upon entry of the Final Order and subject to the conditions in <u>Section 5</u>, (i) the Borrowers shall be entitled to draw the full remaining amount of the Commitment of New Money DIP Loans in the principal amount of up to $5,400,000 which amount shall be used in accordance with the DIP Budget, and (ii) Lender shall be entitled to refinance into and have constitute DIP Loans hereunder, the outstanding principal balance of and interest and fees accrued on Lender's Prepetition Secured Debt in an amount equal to $5,400,000 which shall be allocated, as between Lender's Prepetition First Lien Secured Debt and Lender's Prepetition Second Lien Secured Debt, as set forth in Section 2.02(d) below (such amount, collectively, the "<u>Final DIP Loans</u>").

(d)    <u>Allocation of Roll-Up Loans</u>.  All Roll-Up Loans provided for under this Agreement shall be treated as a roll-up of any outstanding amounts  (including principal, interest and fees) owing under Lender's Prepetition First Lien Secured Debt, and as to the balance, if any, as a roll-up of the Prepetition Second Lien Secured Debt.  The deemed borrowing by the Borrowers of the Roll-Up Loans shall entitle the Borrowers to receive for cancellation an equivalent aggregate amount (including principal, interest and fees) of Prepetition Secured Debt from Lender and shall not entitle the Borrowers to receive any cash or other consideration from Lender on account of any Roll-Up Loans and, notwithstanding that no such cash or other consideration is exchanged, the Borrowers shall owe the aggregate principal amount of the Roll-Up Loans to Lender under this Agreement and not under the Prepetition First Lien Loan Agreement or Prepetition Second Lien Loan Agreement, as applicable.

(e)    <u>No Reborrowing</u>.  Amounts borrowed (or, in the case of Roll-Up Loans, deemed borrowed) under Section 2.02(b) and Section 2.02(c) and repaid or prepaid may not be reborrowed.  The applicable Commitments shall be automatically and permanently reduced to reflect the funding of the applicable DIP Loans.

**Section 2.03    Payment**.

(a)    <u>Maturity of DIP Loans</u>.  The Borrowers shall pay to Lender the outstanding principal amount of the DIP Loans on the earliest of (i) three (3) months following the Closing Date, (ii) the date of consummation of any sale of all or substantially all of the assets comprising the Debtors' estates pursuant to section 363 of the Bankruptcy Code and (iii) the date of acceleration of the DIP Loans and the termination of the DIP Facility upon the occurrence of an Event of Default in accordance with this Agreement (the earliest of such dates, the "<u>Maturity Date</u>").  The Debtors may prepay the DIP Loans in cash in full or in part without penalty.

**Section 2.04    Taxes, Duties and Fees**.

(a)    Any and all payments under this Agreement shall be made, in accordance with this Section 2.04, free and clear of and without deduction for any withholding Taxes except as required by applicable law. If any Taxes are required by applicable law to be withheld from any amounts payable under this Agreement, (i) if such Tax is an Indemnified Tax, the amount payable shall be increased by as much as shall be necessary so that, after making all required withholdings (including withholdings on the additional amounts), the payee shall receive an amount equal to the sum it would have received had no such withholdings been made (any and all such additional amounts payable shall hereafter be referred to as the "<u>Additional Amounts</u>"), (ii) the payor shall make such withholdings, and (iii) the payor shall pay the full amount withheld to the relevant taxing or other authority in accordance with applicable law.  Within thirty (30) days after the date of any payment of such Taxes, the payor shall furnish to the applicable payee the original or a certified copy of a receipt issued by such Governmental Authority evidencing payment thereof or other evidence of such payment reasonably satisfactory to such payee.  The Borrowers agree to file any necessary withholding Tax returns or statements when due, and will file any information reports with respect to its withholding and other obligations hereunder.

(b)    In addition, the Borrowers shall timely pay to the relevant Governmental Authority in accordance with applicable law and authorizes the applicable payee to pay in its name

(but without duplication), any Other Taxes.  Within thirty (30) days after the date of any payment of Other Taxes, the Borrowers shall furnish to the applicable payee the original or a certified copy of a receipt evidencing payment thereof or other evidence of such payment reasonably satisfactory to such payee.

(c)  The Borrowers shall reimburse and indemnify, within ten (10) days after receipt of demand therefor, each payee for all withholding Taxes and Other Taxes to which this Section 2.04 applies, whether or not such Taxes were correctly or legally imposed or asserted.

(d)  If Lender determines in good faith that it has received a refund from a Government Authority relating to Taxes in respect of which any Borrower paid Additional Amounts or made a payment pursuant to Section 2.04(c), Lender shall promptly pay such refund to such Borrower, net of all out-of-pocket expenses (including any Taxes imposed thereon) of Lender incurred in obtaining such refund, and without interest (other than interest paid by the relevant Governmental Authority with respect to such refund); provided that the Borrowers, upon the request of Lender, agree to repay the amount paid over to the Borrowers (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to Lender if Lender is required to repay such refund to such Governmental Authority.  Nothing in this Section shall require Lender to disclose any information it deems confidential (including, without limitation, its tax returns) to any Person, including to the Borrowers.

(e)  Each Lender shall deliver to the Borrowers on or about the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of a Borrower), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax.  In addition, any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any DIP Loan shall deliver to the Borrowers, at the time or times reasonably requested by any Borrower, such properly completed and executed documentation reasonably requested by the Borrower as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by a Borrower, shall deliver such other documentation prescribed by law or reasonably requested by a Borrower as will enable the Borrower to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

**Section 2.05   Costs, Expenses and Losses**.  If, as a result of any failure by any Borrower to pay any sums due under this Agreement on the due date therefor (after the expiration of any applicable grace periods), Lender shall incur commercially reasonable costs, expenses and/or losses, by reason of the liquidation or redeployment of deposits from third parties or in connection with obtaining funds to maintain any DIP Loans, the Borrowers shall pay to Lender upon request by Lender, the amount of such costs, expenses and/or losses within five (5) Business Days after receipt by the Borrowers of a certificate from Lender setting forth in reasonable detail such costs, expenses and/or losses, along with supporting documentation.  For the purposes of the preceding sentence, "costs, expenses and/or losses" shall include, without limitation, any interest paid or payable to carry any unpaid amount and any loss, premium, penalty or expense which may be incurred in obtaining, liquidating or employing deposits of or borrowings from third parties in order to make, maintain or fund the DIP Loans or any portion thereof.

**Section 2.06    Interest**.

(a)    (i) The Interim DIP Loans shall accrue interest from the Closing Date and (ii) the Final DIP Loans shall accrue interest from the date on which the Final DIP Loans are made or deemed made, which date shall be no later than two Business Days from the entry of the Final Order.

(b)    Subject to Section 2.07, the outstanding principal amount of the DIP Loans shall bear interest at the Interest Rate (calculated on the basis of the actual number of days elapsed, based on a 360-day year).  Accrued interest shall be due and payable on the Maturity Date; provided that in the event of any repayment or prepayment of any DIP Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment.  Accrued interest will be paid in Dollars.

(c)    For the purposes of this Agreement, whenever interest is calculated on the basis of a period which is less than the actual number of days in a calendar year, each rate of interest determined pursuant to such calculation is equivalent to such rate multiplied by the actual number of days in the calendar year in which such rate is to be ascertained and divided by the number of days used as the basis of such calculation.  Each determination by Lender of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest or demonstrable error.

**Section 2.07    Default Interest**.  Without limiting the remedies available to Lender under this Agreement or otherwise, to the maximum extent permitted by applicable law, if an Event of Default has occurred and is continuing, the Borrowers shall pay, in respect of outstanding principal and interest on the DIP Loans under this Agreement and any other amount due but unpaid under this Agreement, at the rate per annum equal to the Interest Rate plus two percent (2%) (the "Default Rate") for so long as such Event of Default is continuing.  Such interest shall be payable on demand in Dollars.

**Section 2.08    Fees and Costs**.

(a)    Upfront Fee.  The Borrowers agree to pay to Lender, a fully-earned, non-refundable upfront fee, in an amount equal to 3.00% of the New Money DIP Loans (the "Upfront Fee"), payable as an original issue discount at the time, and on the amount, of each such New Money DIP Loan draw.

(b)    The Borrowers agree to pay to Lender all amounts set forth in Section 8.05.  Any fees, charges and disbursement of counsel to Lender shall be paid by the Borrowers as provided under the DIP Budget.

**Section 2.09    Payments Generally**.

(a)    The Borrowers shall make each payment required to be made by it hereunder (whether of principal, interest, fees, or of amounts payable under Section 2.03, Section 2.067 or otherwise) prior to 12:00 noon, New York City time, on the date when due, by wire transfer in Dollars that constitute immediately available funds, without defense, deduction, recoupment, set-off or counterclaim. fees, once paid, shall not be refundable under any circumstances absent

manifest error (e.g., as a result of a clerical mistake). Any amounts received after such time on any date may, in the discretion of Lender, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to Lender at its offices specified in Section 8.01 or at the bank account specified by Lender. If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. All payments hereunder shall be made in Dollars. The Borrowers shall pay all and any costs (administrative or otherwise) imposed by banks, clearing houses, or any other financial institution, in connection with making any payments hereunder.

(b)   If at any time insufficient funds are received by and available to Lender to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) first, towards payment of interest and fees then due hereunder and (ii) second, towards payment of principal then due hereunder.

## ARTICLE III
## SECURITY FOR THE DIP LOANS

**Section 3.01   DIP Liens**. Pursuant to the DIP Orders and in accordance with the terms hereof, all of the Obligations will be secured, pursuant to sections 364(d)(1) and 364(c) (as applicable) of the Bankruptcy Code, by a valid and enforceable, first priority, fully-perfected security interest in the Collateral, including, without limitation, any and all causes of action, including after entry of a Final Order, any Avoidance Action Proceeds recovered in respect of the Debtor's claims and causes of action arising under Bankruptcy Code sections 544, 545, 547, 548 and 550 or any other similar state or federal law, subject to the Carve-Out and Permitted Exceptions. The liens granted under the DIP Facility shall prime and be senior to the liens securing the Prepetition Secured Debt and will be junior only to the Carve-Out and Permitted Exceptions.

**Section 3.02   Filing not Required to Perfect.** All the liens described herein with respect to the assets of any Debtor shall be effective and perfected as of the entry of the Interim Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements. Notwithstanding the foregoing, the DIP Lender may take, and the Debtors shall authorize and execute, whatever action that it reasonably believes is advisable to perfect the liens granted herein (including, without limitation, the filing of UCC financing statements, the giving of notices and the endorsement of notices on title documents).

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES

**Section 4.01   Representations and Warranties of the Borrowers**. Each Borrower represents and warrants as of the Closing Date, and as of each day on which the Borrowers receive a DIP Loan, that:

(a)   the Borrowers are conducting their businesses in compliance with their Organizational Documents, which are in full force and effect with no material defaults outstanding thereunder;

(b)    no Default or Event of Default has occurred under this Agreement;

(c)    the obligation of the Borrowers to make any payment under this Agreement (together with all charges in connection therewith) is absolute and unconditional, and there exists no right of setoff or recoupment, counterclaim, cross-claim or defense of any nature whatsoever to any such payment;

(d)    no Indebtedness of any Borrower exists other than Permitted Indebtedness;

(e)    Parent Borrower is a corporation duly organized under the laws of the state of Delaware, and, other than as a result of the Chapter 11 Cases, is in good standing under such laws. Each Subsidiary Borrower is a corporation or limited liability company duly organized under the laws of the state of its incorporation or formation, as applicable, and other than as a result of the Chapter 11 Cases or, as individually or in the aggregate would not result in a Material Adverse Effect, is in good standing under the laws of the jurisdiction of its organization.  Subject to the entry and terms of the DIP Order, each Borrower has full power and authority to own its properties and conduct its business and is duly qualified to do business as a foreign entity and is in good standing in each jurisdiction in which the conduct of its business makes such qualification necessary and in which the failure to so qualify would have a Material Adverse Effect;

(f)    other than the Chapter 11 Cases or as set forth on Schedule 4.01(f), (i) there is not pending, or, to the knowledge of any Borrower, threatened, any action, suit or other proceeding before any Government Authority to which such Borrower is a party [that could reasonably be expected to have a Material Adverse Effect, or result in liabilities in excess of $1,500,000] and (ii) there are no current, or, to the knowledge of any Borrower, pending, legal, governmental or regulatory enforcement actions, suits or other proceedings to which any Borrower or any of the Borrowers' assets is subject that could reasonably be expected to have a Material Adverse Effect;

(g)    subject to the entry of the DIP Order, this Agreement been duly authorized, executed and delivered by the Borrowers and constitutes the valid, legal and binding obligation of each Borrower enforceable in accordance with its terms.  The execution, delivery and performance of this Agreement by the Borrowers and the consummation of the transactions herein contemplated will not, (i) result in the creation or imposition of any Lien other than Liens on the Collateral and the Prepetition Collateral, as applicable, in favor of Lender as provided by this Agreement and the Permitted Exceptions, upon any assets of the Borrowers pursuant to any agreement to which any Borrower is a party or by which any Borrower is bound or to which any of the assets of any Borrower are subject, (ii) result in any violation of or conflict with the provisions of any Borrower's Organizational Documents or (iii) result in the violation of any law or any judgment, order, rule, regulation or decree of any Government Authority.  Subject to the entry of the DIP Order, no consent, approval, authorization or order of, or registration or filing with any Government Authority is required for the execution, delivery and performance of this Agreement or for the consummation by any Borrower of the transactions contemplated hereby except for such registrations and filings in connection with the entry into this Agreement that are necessary to comply with applicable federal, state or provincial securities laws and filings contemplated by the Final Order, and each Borrower has the power and authority to enter into this Agreement and to consummate the transactions contemplated under this Agreement;

(h)    subject to the entry of the DIP Order, each Borrower holds, and is operating in compliance in all material respects with, all franchises, grants, authorizations, licenses, permits, easements, consents, certificates and orders of any Government Authority (collectively, "Necessary Documents") required for the conduct of its business, and all Necessary Documents are valid and in full force and effect, except for such Necessary Documents as would not, individually or in the aggregate, result in a Material Adverse Effect.  No Borrower has received written notice of any revocation or modification of any Necessary Document, and, to the knowledge of Borrower, no Borrower has any reason to believe that any Necessary Document will not be renewed in the ordinary course.  Each Borrower is in compliance in all material respects with all federal, state, provincial, local and foreign laws, regulations, orders and decrees applicable to the conduct of its business, except for such laws, regulations, orders and decrees as would not, individually or in the aggregate, result in a Material Adverse Effect;

(i)    Each Borrower has good and marketable title to all of its assets free and clear of all Liens, other than (i) carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business, and (ii) the Prepetition Liens, the DIP Liens and the Adequate Protection Liens;

(j)    Each Borrower owns or has the right to use pursuant to a valid and enforceable written license, implied license or other legally enforceable right all of the Intellectual Property that is necessary for the conduct of its business as currently conducted.  To the knowledge of Borrower, no Borrower, employee, former employee, licensee, former licensee, contractor, consultant, service provider or other Person has infringed or misappropriated any material rights of Borrower or others with respect to the Intellectual Property.  There is no pending or, to the knowledge of any Borrower, threatened action, suit, other proceeding or claim that any Borrower infringes upon, violates or uses the Intellectual Property rights of others without authorization, and no Borrower has received any written notice regarding any such action, suit, other proceeding or claim;

(k)    Except as set forth on Schedule 4.01(k):

(i)    all income and other material Tax returns, reports and statements (collectively, the "Tax Returns") required to be filed by the Borrowers have been, or will be, timely filed.  Such Tax Returns are, or will be, true, complete and correct in all respects.  All Taxes due and owing by Borrowers (whether or not shown on a Tax Return) have been, or will be, timely paid;

(ii)    Borrowers have withheld and paid each Tax required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, customer, shareholder or other party, and complied with all information reporting and backup withholding provisions of applicable law;

(iii)    no extensions or waivers of statutes of limitations have been given or requested with respect to any Taxes of Borrowers;

(iv)    all deficiencies asserted, or assessments made, against Borrowers as a result of any examinations by any taxing authority have been fully paid; and

(v)    no Borrower is a party to any action by any taxing authority, and there are no pending or threatened actions by any taxing authority; and

(l)    the Parent Borrower maintains a system of internal accounting controls in accordance with GAAP.

**Section 4.02    The Borrowers' Acknowledgment**.  The Borrowers acknowledge that the representations and warranties referred to in Section 4.01 have been made with the intention of persuading Lender to enter into this Agreement, make the Commitment and fund the DIP Loans and that Lender has entered into this Agreement, made the Commitment and agreed to fund the DIP Loans on the basis of, and in full reliance on, each of such representations and warranties.

# ARTICLE V
# CONDITIONS

**Section 5.01    Conditions of Effectiveness**.  The effectiveness of this Agreement and the obligation of Lender to make the DIP Loans hereunder is subject to the satisfaction of the following conditions:

(a)    Lender shall have received from each party hereto counterparts of this Agreement signed on behalf of such party;

(b)    the Borrowers shall have paid all fees, costs and expenses then payable by the Borrowers (including the legal fees and expenses of Sullivan & Worcester LLP, counsel to Lender);

(c)    Lender shall have received a DIP Budget, which initial DIP Budget is attached hereto as Schedule 3;

(d)    the Bankruptcy Court shall have entered the Interim Order;

(e)    solely with respect to the Lender's obligation to fund the Final DIP Loans, the Bankruptcy Court shall have entered the Final Order;

(f)    the DIP Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any respect;

(g)    Lender shall have received prior to the Closing Date all documentation and other information required by bank regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act;

(h)    the representations and warranties contained herein and in each other certificate or other writing delivered to Lender pursuant hereto or thereto shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations or warranties that already are qualified or modified as to "materiality" or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification) on and as of the date of the proposed borrowing, to the same extent as though made on and as of that date, except to the extent such representations and

warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations or warranties that already are qualified or modified as to "materiality" or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification) on and as of such earlier date;

(i)    no event shall have occurred and be continuing or would result from the funding of such DIP Loan that would constitute an Event of Default or a Default;

(j)    the making of any DIP Loan shall not contravene any law, rule or regulation applicable to Lender;

(k)    the Borrowers shall be in compliance in all respects with the terms of the DIP Order;

(l)    no trustee or examiner shall have been appointed with respect to any Borrower or its properties;

(m)    there exists no material impairment to the DIP Liens, and the DIP Order provides for the Adequate Protection Liens, the DIP Superpriority Claim and the Accrued Adequate Protection Payments;

(n)    except for actions stayed by 11 U.S.C. § 362 and those set forth on Schedule 4.01, other than the Chapter 11 Cases, no new action shall be pending or threatened (to the knowledge of any Borrower) against any Borrower; and

(o)    solely with respect to the Lender's obligation to fund the Final DIP Loans, if the JUUL Settlement has been received by the Borrowers, the proceeds thereof shall have been used in accordance with the DIP Budget, and the aggregate amount of such proceeds shall reduce Lender's remaining Commitment under the Final DIP Loans on a dollar-for-dollar basis.

Lender shall be entitled, but not obligated, to reasonably request and receive, additional information if, in the good faith judgment of Lender, such request is warranted under the circumstances.

## ARTICLE VI
## COVENANTS

**Section 6.01  Affirmative Covenants**. Until the Commitment has expired or been terminated and the principal of and interest on all DIP Loans and all fees and all other amounts payable hereunder shall have been paid in full, each Borrower covenants and agrees with Lender as follows:

(a)    Each Borrower shall maintain its existence and qualify, and remain qualified, to do its business as currently conducted, except where the failure to maintain such qualification would not reasonably be expected to have a Material Adverse Effect;

(b)    Each Borrower shall comply in all material respects with all applicable laws, except where the necessity of compliance therewith is contested in good faith by appropriate proceedings;

(c)    Each Borrower shall maintain all material authorizations required to conduct its business;

(d)    Each Borrower shall promptly notify Lender of the occurrence of any Default or Event of Default;

(e)    On the first Thursday of the second week following the Closing Date, and every Thursday thereafter, the Borrowers shall deliver to (i) the DIP Lender and (ii) Sullivan & Worcester LLP a variance report for the one week period following the Closing Date, and each subsequent one week period ending each week thereafter (each a "Reporting Period"), with the report for each such subsequent one week period setting forth for the one-week period  ended on the immediately preceding Friday prior to the delivery thereof, (1) the positive variance (as compared to the DIP Budget) of the aggregate operating disbursements (excluding professional fees) made by the Borrowers in the aggregate for the applicable Reporting Period, and (2) an explanation, in reasonable detail, for any material positive variance (in the case of disbursements), certified by an Authorized Officer of the Borrowers (the "Variance Report").  Without giving effect to the making of the DIP Loans or the repayments or prepayments of the DIP Loans, beginning with the delivery of the initial Variance Report and tested, as of the last day of each applicable Reporting Period, in no event shall (i) the positive variance (as compared to the DIP Budget) of the aggregate operating disbursements (excluding professional fees) made by the Debtors exceed $250,000, and (ii) the positive variance of the aggregate operating disbursements made to the Borrowers' foreign Subsidiaries exceed 120% of the amount set forth in the DIP Budget for the applicable Reporting Period (in each case, the "Permitted Variance"); provided however any amounts approved for a specific period that are not fully utilized in such period may be used in any succeeding period;

(f)    The Borrowers shall maintain general and professional liability insurance, including products/completed operations liability coverage, and such other insurance coverage in such amounts and with respect to such risks as Lender may request from time to time;

(g)    The Borrowers shall use the proceeds of the DIP Loans in accordance with Section 2.01 and all cash and deposit account proceeds or other cash shall remain subject to a Lien in favor of Lender in accordance with the Final Order;

(h)    The Borrowers shall deliver to Lender as soon as practicable in advance of filing with the Bankruptcy Court, the proposed Final Order and all other proposed orders and pleadings related to this Agreement;

(i)    The Borrowers shall provide any reasonable additional reporting requirements requested by Lender, including, without limitation, with respect to litigation, contingent liabilities, and environmental events;

(j)    The Borrowers shall provide periodic access by Lender and its advisors to information and senior personnel, senior management and other company advisors, including conference calls with such persons upon any reasonable request by Lender;

(k)    The Borrowers shall hold all amounts disbursed by Lender as New Money DIP Loans in one or more of Knotel Inc.'s operating accounts maintained with an authorized depository located within the United States.  The Borrowers may transfer proceeds of the New Money DIP Loans to the foreign subsidiaries of the Borrowers specified in the Budget to fund weekly expenses of such foreign subsidiaries solely to the extent permitted under the Budget.  Upon receipt of any notice of Event of Default under the DIP Credit Agreement from Lender, the Debtors agree to immediately cease any such funding of foreign operations absent the written consent of Lender; and

(l)    The Borrowers agree to use all proceeds of the JUUL Settlement in accordance with the DIP Budget.

**Section 6.02   Negative Covenants**.  Unless Lender shall otherwise agree, the Borrowers shall not:

(a)    (i) liquidate or dissolve, or (ii) directly or indirectly, by operation of law or otherwise amalgamate or merge with, consolidate with, acquire all or substantially all of the assets or stock of, or otherwise combine with or acquire, any Person.  No Borrower shall establish any Subsidiary without the consent of Lender;

(b)    (i) enter into any partnership, joint venture, syndicate, pool, profit-sharing or royalty agreement or other combination, or engage in any transaction, whereby its income or profits are, or might be, shared with another Person, (ii) enter into any management contract or similar arrangement whereby a substantial part of its business is managed by another Person, or (iii) distribute, or permit the distribution of, any of its assets, including its intangibles, to any Affiliate, including by way of loans or advances or purchase or redemption of equity interests in a Person;

(c)    create, incur or suffer any Lien upon any of its assets other than the DIP Liens, the Prepetition Liens, Permitted Exceptions and the Adequate Protection Liens;

(d)    create, incur, assume, guarantee or remain liable with respect to any Indebtedness, other than Permitted Indebtedness;

(e)    acquire any assets (other than assets acquired in the ordinary course of business consistent with past practices), directly or indirectly, in one or more related transactions;

(f)    (i) engage in any business other than the Borrowers' business as conducted on the Agreement Date or (ii) modify or alter its organizational documents, except as may be required by the Bankruptcy Code in connection with the Chapter 11 Cases;

(g)    use the proceeds of the DIP Loans other than in accordance with Section 2.01 and the DIP Budget (subject to the Permitted Variance).  For the avoidance of doubt, other than amounts provided for such investigation in the DIP Order, no proceeds of the DIP Loans may be used to pay any fees or expenses in connection with the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against Lender or their respective advisors, agents or subagents, including, without limitation, challenging the amount, validity, perfection, priority or enforceability of, or asserting any defense, counterclaim or offset to, the obligations arising under the Prepetition Secured Loans, and the liens and claims thereunder in favor of Lender;

(h)    incur, create or assume, suffer to exist or permit any superpriority claim which is *pari passu* or senior to the DIP Superpriority Claim against the Borrowers, except for the Carve-Out, Permitted Exceptions and amounts set forth in the DIP Budget;

(i)    dispose any of its assets (including, without limitation, any sale and leaseback transaction) other than in the ordinary course of business or in connection with the Asset Sale;

(j)    enter into any agreement to return any of its inventory outside the ordinary course of business to any of its creditors for application against any pre-Petition Date Indebtedness, pre-Petition Date trade payables or other pre-Petition Date claims under section 546(h) of the Bankruptcy Code;

(k)    make (i) any payments on account of any creditor's claims against any Borrower, (ii) payments on account of claims or expenses arising under section 503(b)(9) of the Bankruptcy Code, (iii) payments in respect of a reclamation program or (iv) payments under any management incentive plan or on account of claims or expenses arising under section 503(c) of the Bankruptcy Code, except in each case, in amounts and on terms and conditions that (A) are approved by order of the Bankruptcy Court and (B) are expressly permitted by the DIP Budget or otherwise approved by Lender in its sole discretion and in writing;

(l)    subject to the terms set forth in the DIP Order, obtain, or seek to obtain, any stay on the exercise of the remedies of Lender hereunder or under the Final Order.

## ARTICLE VII
## EVENTS OF DEFAULT

**Section 7.01    General Acceleration Provision upon Events of Default**.

(a)    If any event specified in this Section 7.01 shall have occurred and be continuing beyond the applicable cure period (each, an "Event of Default"), Lender may (x) declare the principal of, and accrued and unpaid interest on, the DIP Loans or any part thereof (together with any other amounts accrued or payable hereunder) to be, and the same shall thereupon become, immediately due and payable and (y) terminate all commitments without any further notice and without any presentment, demand, or protest of any kind, all of which are hereby expressly waived by the Borrowers, and, subject to the terms set forth in the DIP Order, take any further action available at law or in equity.

(b)    Each of the following shall constitute an Event of Default:

(i)        a Borrower shall fail to pay any amount outstanding on the DIP Loans (principal, interest or any fee or other amount payable hereunder) on the Maturity Date, by acceleration or otherwise;

(ii)       any representation or warranty made or deemed made by or on behalf of any Borrower in or in connection with this Agreement, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement shall prove to have been incorrect when made or deemed made in any material respect;

(iii)      a Borrower shall fail to observe or perform any covenant, condition or agreement contained in this Agreement and such failure shall continue for 5 Business Days;

(iv)      a Material Adverse Effect has occurred or is occurring;

(v)       a Chapter 11 Case concerning a Borrower shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code or any Borrower shall file a motion or other pleading or support a motion or other pleading filed by any other Person seeking the dismissal or conversion of its Chapter 11 Case under Bankruptcy Code section 1112 or otherwise; a trustee under chapter 7 or chapter 11 of the Bankruptcy Code, a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Bankruptcy Code section 1106(a)(3) and (4)) under Bankruptcy Code section 1106(b) shall be appointed in the Chapter 11 Case; or Borrower shall file a motion or other pleading or shall consent to a motion or other pleading filed by any other Person seeking any of the foregoing;

(vi)      an order of the Bankruptcy Court shall be entered granting any superpriority claim (other than the Carve-Out) in any of the Chapter 11 Cases which is *pari passu* with or senior to the DIP Superpriority Claim or the Adequate Protection Claim against any Borrower hereunder or any Lien or security interest that is *pari passu* with or senior to the DIP Liens and security interest securing the DIP Loan, or the Adequate Protection Liens and security interest securing the Prepetition Loan, or any Borrower takes any action seeking or supporting the grant of any such claim, Lien or security interest, in each case except as expressly permitted hereunder;

(vii)     the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Bankruptcy Code section 362 to the holder or holders of any security interest to proceed against, including foreclosure (or the granting of a deed in lieu of foreclosure or the like) on, any assets of any Borrower;

(viii)    (A) an order of the Bankruptcy Court (or any other court of competent jurisdiction) shall be entered (1) reversing, staying for a period in excess of 10 days or vacating the DIP Order, (2) without the written consent of Lender, amending, supplementing or modifying the DIP Order (other than the Final Order) or (3) denying or terminating the use of cash collateral by any Borrower pursuant to the DIP Order, or (B) any Borrower shall file a motion or other pleading or shall consent to a motion or other pleading filed by any other Person seeking any of the foregoing (other than the Final Order);

(ix)    [reserved];

(x)    the filing of any motion or proceeding which could materially impair Lender's rights under this Agreement;

(xi)    a plan that is not in form and substance reasonably satisfactory to Lender shall be filed by the Borrowers in the Chapter 11 Case, without the express written consent of Lender;

(xii)    the Interim Order shall not have been entered within three (3) days following the Petition Date;

(xiii)    the Final Order shall not have been entered within twenty-five (25) days following the Petition Date; and

(xiv)    the Bankruptcy Court shall not have entered an order approving the Asset Sale within thirty-five (35) days following the Petition Date.

**Section 7.02   Recovery of Amounts Due**.  Subject to the DIP Order, if any amount payable hereunder is not paid as and when due, the Borrowers hereby authorize Lender to proceed, to the fullest extent permitted by applicable law, without prior notice, by right of setoff, banker's lien or counterclaim, against any moneys or other assets of the Borrowers to the full extent of all amounts payable to Lender.

## ARTICLE VIII
## MISCELLANEOUS

**Section 8.01   Notices**.  Any notice to be given under this Agreement shall be sent by certified or registered mail (return receipt requested) or delivered personally or by courier (including a recognized overnight delivery service) or by facsimile or by electronic mail and shall be effective five (5) days after being placed in the mail, if mailed by regular United States mail, or upon receipt, if delivered personally, by courier, by facsimile or electronic mail in each case addressed to a Party.  The addresses for such communications shall be:

| If to any Borrower: | Knotel, Inc. and its Subsidiaries c/o Knotel, Inc. 33 West 17th Street |
|---|---|

|  | New York, NY 10011 |
|---|---|
|  | Attn: John Jureller-CFO |
|  | Email: jjureller@knotel.com |
| With copy to: | Milbank LLP |
|  | 55 Hudson Yards |
|  | New York, NY 10001-2163 |
|  | Attn: Mark Shinderman |
| If to Lender: | Digiatech, LLC |
|  | 125 Park Avenue |
|  | New York, NY 10017 |
|  | Attn: Michael Rispoli |
|  | Email: mrispoli@ngkf.com |
| With a copy to: | Sullivan & Worcester LLP |
|  | 1633 Broadway |
|  | New York, NY 10019 |
|  | Attn: Jeffrey R. Gleit, Esq. |
|  | Email: jgleit@sullivanlaw.com |

**Section 8.02   Waiver of Notice**.  Whenever any notice is required to be given to Lender or the Borrowers under this Agreement, a waiver thereof in writing signed by the person or persons entitled to such notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

**Section 8.03   Reimbursement of Legal and Other Expenses**.  The Borrowers shall pay (i) all reasonable and documented out-of-pocket expenses incurred by Lender, including, without limitation, the reasonable fees, charges and disbursements of counsel, financial advisors and other outside consultants for Lender, the reasonable travel, photocopy, mailing, courier, telephone and other similar expenses, and the cost of environmental audits and surveys and appraisals, in connection with the preparation, negotiation, execution, delivery and administration (both before and after the execution hereof and including advice of counsel to Lender as to the rights and duties of Lender with respect thereto) of this Agreement and any amendments, modifications or waivers of or consents related to the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated) (ii) all costs, expenses, Taxes, assessments and other charges incurred by Lender in connection with any filing, registration, recording or perfection of any security interest contemplated by this Agreement or any other document referred to therein, (iii) all out-of-pocket expenses incurred by Lender, including, without limitation the reasonable fees, charges and disbursements of any counsel, financial advisors and other outside consultants for Lender, in connection with the enforcement or protection of its rights in connection with this Agreement, including its rights under this Section 8.03, or in connection with the DIP Loans made (or deemed made) hereunder, including, without limitation, all such out-of-pocket expenses incurred in respect of such DIP Loans.

**Section 8.04   Right of Setoff**.   If an Event of Default shall have occurred and be continuing, Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by Lender to or for the credit or the account of the Borrowers or any Subsidiary against any of and all the obligations of the Borrowers or any Subsidiary owed to Lender now or hereafter existing under this Agreement, irrespective of whether or not Lender shall have made any demand under this Agreement and although such obligations may be unmatured.   The rights of Lender under this Section 8.04 are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.

**Section 8.05   No Third Party Beneficiaries**.   This Agreement and the agreement of Lender to make the DIP Loans hereunder are solely for the benefit of the Borrowers, and no other Person shall have any rights, claims, remedies or privileges hereunder against Lender for any reason whatsoever.   There are no third party beneficiaries.

**Section 8.06   US Patriot Act Notice**.   Lender hereby notifies the Borrowers that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Patriot Act"), it is required to obtain, verify and record information that identifies the Borrowers, which information includes the name and address of the Borrowers and other information that will allow such Lender to identify the Borrowers in accordance with the Patriot Act.

**Section 8.07   Governing Law**.   All questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by, construed and enforced in accordance with the laws of the State of New York except to the extent New York law is superseded by the Bankruptcy Code.   All legal proceedings concerning the interpretations, enforcement and defense of the transactions contemplated by this Agreement (whether brought against a Party or its respective affiliates, directors, officers, shareholders, employees or agents) shall be commenced exclusively in the Bankruptcy Court, and if the Bankruptcy Court does not have (or abstains from) jurisdiction, in the courts of the State of New York sitting in Manhattan County and of the United States District Court of the District of New York.   Each Party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such Party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof.   Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law. The parties hereto hereby waive all rights to a trial by jury.

**Section 8.08   Successors and Assigns**.

(a) This Agreement shall bind and inure to the respective successors and assigns of the parties hereto, except that no Borrower may assign or otherwise transfer all or any part of its rights hereunder without the prior written consent of Lender (and any attempted assignment or transfer by any Borrower without such consent shall be null and void).   Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated

hereby, the Related Parties of Lender any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b) Lender may, with the consent of the Parent Borrower, assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement; provided that no such consent of the Parent Borrower shall be required if an Event of Default has occurred and is continuing.

**Section 8.09    Entire Agreement**.  This Agreement contains the entire understanding of the parties hereto with respect to the matters covered thereby and supersede any and all other written and oral communications, negotiations, commitments and writings with respect thereto.

**Section 8.10    Amendments**.  This Agreement may not be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Borrowers and Lender;

**Section 8.11    Severability**.  If any provision of this Agreement shall be invalid, illegal or unenforceable in any respect under any law, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.  The parties hereto shall endeavor in good faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provision.

**Section 8.12    Counterparts**.  This Agreement may be executed by each Party on separate counterparts, each of which and any facsimile copies thereof shall be deemed an original, but all of which together shall constitute one and the same agreement.

**Section 8.13    Survival**.

(a) All covenants, agreements, representations and warranties made by the Borrowers herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of any DIP Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any DIP Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Commitment has not expired or terminated.

(b) To the extent that any payments on the Obligations or proceeds of any Collateral are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver or other Person under any bankruptcy law, common law or equitable cause, then to such extent, the Obligations so satisfied shall be revived and continue as if such payment or proceeds had not been received and Lender's Liens, security interests, rights, powers and remedies under this Agreement shall continue in full force and effect.  In such event, this Agreement shall be automatically reinstated and the Borrowers shall take such action as may be reasonably requested by Lender to effect such reinstatement.

**Section 8.14   Waiver**.   Neither the failure of, nor any delay on the part of, any Party in exercising any right, power or privilege hereunder, or under any agreement, document or instrument mentioned herein, shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder, or under any agreement, document or instrument mentioned herein, preclude other or further exercise thereof or the exercise of any other right, power or privilege; nor shall any waiver of any right, power, privilege or default hereunder, or under any agreement, document or instrument mentioned herein, constitute a waiver of any other right, power, privilege or default or constitute a waiver of any default of the same or of any other term or provision.   No course of dealing and no delay in exercising, or omission to exercise, any right, power or remedy accruing to Lender upon any default under this Agreement or any other agreement shall impair any such right, power or remedy or be construed to be a waiver thereof or an acquiescence therein; nor shall the action of Lender in respect of any such default, or any acquiescence by it therein, affect or impair any right, power or remedy of Lender in respect of any other default.   All rights and remedies herein provided are cumulative and not exclusive of any rights or remedies otherwise provided by law.

**Section 8.15   Indemnity**.

(a) Each Borrower shall, at all times, indemnify and hold harmless (the "Indemnity") Lender and each Related Party of any of the foregoing persons (each, a "Indemnified Person") from any liabilities which an Indemnified Person may incur or to which an Indemnified Person may become subject.   The Indemnity shall not apply with respect to any Indemnified Person to the extent that a court or arbitral tribunal with jurisdiction over the subject matter of the liability, such Indemnified Person and over Lender or such Borrower, as applicable, determines (after such Indemnified Person that had an adequate opportunity to defend its interests), that such liability resulted from the gross negligence or willful misconduct of such Indemnified Person, which determination results in a final, non-appealable judgment or decision of a court or tribunal of competent jurisdiction.   The Indemnity is independent of and in addition to any other agreement of any party under any other document to pay any amount to Lender, and any exclusion of any obligation to pay any amount under this subsection shall not affect the requirement to pay such amount under any other section hereof or under any other agreement.

(b) Promptly after receipt by an Indemnified Person under this Section 8.15 of notice of the commencement of any action (including any governmental action), such Indemnified Person shall deliver to the indemnifying party a written notice of the commencement thereof, and the indemnifying party shall have the right to participate in, and, to the extent the indemnifying party so desires, to assume control of the defense thereof with counsel mutually satisfactory to the indemnifying party and the Indemnified Person.

(c) An Indemnified Person shall have the right to retain its own counsel with the reasonable fees and expenses to be paid by the indemnifying party, if, in the reasonable opinion of counsel for the indemnifying party, the representation by such counsel of the Indemnified Person and the indemnifying party would be inappropriate due to actual or potential differing interests between such Indemnified Person and any other party represented by such counsel in such proceeding.   The indemnifying party shall pay for only one separate legal counsel for each Indemnified Person, and such legal counsel shall be approved by the indemnifying party.   The failure to deliver written notice to the indemnifying party within a reasonable time of the

commencement of any such legal action shall not relieve the indemnifying party of any liability to the Indemnified Person under this Section 8.15, except to the extent that the indemnifying party is actually prejudiced in its ability to defend such action.  The indemnification required by this Section 8.15 shall be made by periodic payments of the amount thereof during the course of the investigation or defense, as such expense, loss, damage or liability is incurred and is due and payable.

(d) Without prejudice to the survival of any other agreement of any of the parties hereunder, the agreements and the obligations of such parties contained in this Section 8.15 shall survive the termination of each other provision hereof and the payment of all amounts payable to Lender hereunder.

Section 8.16   **Interest Limitations**.  This Agreement is hereby expressly limited so that in no contingency or event whatsoever, whether by reason of acceleration or otherwise, shall the amount paid or agreed to be paid to Lender exceed the maximum amount permissible under applicable law.  If from any circumstance whatsoever fulfillment of any provision hereof, at the time performance of such provision shall be due, shall involve transcending the limit of validity prescribed by law, then, ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity, and if from any such circumstance Lender shall ever receive anything which might be deemed interest under applicable law, that would exceed the highest lawful rate, such amount that would be deemed excessive interest shall be applied to the reduction of the principal amount owing on account of the DIP Loan, or if such deemed excessive interest exceeds the unpaid balance of principal of the DIP Loan, such deemed excess shall be refunded to the Borrowers.  All sums paid or agreed to be paid to Lender shall, to the extent permitted by applicable law, be deemed to be amortized, prorated, allocated and spread throughout the full term of the DIP Loan until payment in full so that the deemed rate of interest on account of the DIP Loan is uniform throughout the term thereof.  The terms and provisions of this Section shall control and supersede every other provision of this Agreement.

Section 8.17   **Further Assurances**.  The Borrowers at their expense will, and will cause each Subsidiary to, promptly execute and deliver to Lender all such other documents, agreements and instruments reasonably requested by Lender to comply with, cure any defects or accomplish the conditions precedent, covenants and agreements of the Borrowers in this Agreement or to further evidence and more fully describe the collateral intended as security for the Obligations, or to correct any omissions in this Agreement or to state more fully the obligations secured herein, or to perfect, protect or preserve any Liens created pursuant to this Agreement or the priority thereof, or to make any recordings, file any notices or obtain any consents, all as may be reasonably necessary or appropriate, in the sole discretion of Lender, in connection therewith.

Section 8.18   **DIP Order**.  In the event of any conflict between the terms of the DIP Order and the terms of this Agreement, the terms of the DIP Order shall govern and control.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed.


**KNOTEL, INC**.,

By:_____
Name:  Amit Khanna
Title:   Assistant Secretary and General Counsel


**SUBSIDIARY BORROWERS**:

100 BUSH ST SF LLC

101 FIFTH AVE NYC LLC

101 MONTGOMERY ST SF LLC

10301 JEFFERSON BLVD LA LLC

110 W 32ND NYC LLC

1100 GLENDON LA LLC

1120 20TH ST DC LLC

116 W 32ND NYC LLC

12 E 33 ST NYC LLC

12121 BLUFF CREEK LA LLC

12211 WASHINGTON LA LLC

125 FIFTH AVE NYC LLC

1250 EYE ST DC LLC

12555 WEST JEFFERSON WAY LA LLC

126 POST ST SF LLC

129 W 29TH NYC LLC

131 RODEO 102 LA LLC

131 RODEO 250 LA LLC

13160 MINDANAO WAY LA LLC


By:_____
Name:  Amit Khanna
Title:   Assistant Secretary and General Counsel


*[Signature Page to DIP Credit Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed.

**SUBSIDIARY BORROWERS**:

1317 5TH ST LA LLC

1330 CONN AVE DC LLC

1407 BROADWAY NYC LLC

142 BERKELEY ST BOS LLC

1444 MARKET ST SF LLC

146 GEARY ST SF LLC

152 W 25 NYC LLC

1550 BRYANT ST SF LLC

1556 20TH LA LLC

16 W 36 ST NYC LLC

1625 OLY BLVD LA LLC

1640 SEPULVEDA LA LLC

166 GEARY ST SF LLC

1720 EYE ST DC LLC

1725 MONTGOMERY ST SF LLC

19 W 44TH ST NYC LLC

195 BROADWAY NYC LLC

2 LIBERTY SQ BOS LLC

22 W 21 ST NYC LLC

2228 COTTNER LA LLC

23 W 20TH NYC LLC

239 CAUSEWAY ST BOSTON LLC

240 W 35TH NYC LLC

240 W 40 ST NYC LLC

250 MONTGOMERY ST LLC


By:_____
Name:  Amit Khanna
Title:    Assistant Secretary and General Counsel

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed.

**SUBSIDIARY BORROWERS**:

259 W 30TH NYC LLC

26 W 17TH ST NYC LLC

260 W 39TH NYC LLC

275 BATTERY ST SF LLC

28 W 25 NYC LLC

29 W 35TH ST NYC LLC

295 MADISON NYC LLC

30 W 21 ST NYC LLC

300 BROADWAY ST SF LLC

300 MONTGOMERY ST SF LLC

301 BRANNAN ST SF LLC

303 SECOND ST SF LLC

3137 S LA CIENEGA BLVD LA LLC

320 LINCOLN LA LLC

3309 LA CIENEGA PLACE LA LLC

333 BROADWAY SF TENANT LLC

350 SANSOME ST SF LLC

3535 HAYDEN AVE LA LLC

360 MADISON NYC LLC

369 LEXINGTON AVE NYC LLC

390 BROADWAY NYC LLC

40 BROAD ST BOS LLC

400 SUTTER ST SF LLC

405 E 4TH AVENUE SM LLC


By:_____
Name:  Amit Khanna
Title:    Assistant Secretary and General Counsel

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed.

**SUBSIDIARY BORROWERS**:

405 HOWARD STREET SF LLC

429 SANTA MONICA BLVD LA LLC

42FLOORS, LLC

44 E 32ND STREET NYC LLC

44 THOMSON PL BOS LLC

447 BROADWAY NYC LLC

45 W 45 ST NYC LLC

4501 GLENCOE BLVD LA LLC

455 MARKET ST SF LLC

456 MONTGOMERY ST SF LLC

465 CALIFORNIA ST SF LLC

5 BRYANT PARK NYC LLC

50 OSGOOD PL SF LLC

505 HOWARD SF ST LLC

545 5TH AVE NYC LLC

555 MONTGOMERY ST SF LLC

565 COMMERCIAL ST SF LLC

580 8TH AVE NYC LLC

590 FIFTH AVE NYC LLC

597 FIFTH AVE NYC LLC

6 W 28TH NYC LLC

60 MADISON NYC LLC

600 CORPORATE POINTE LA LLC

649 MISSION ST SF LLC

650 FIFTH AVE NYC LLC

By:_____
Name:  Amit Khanna
Title:    Assistant Secretary and General Counsel

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed.

**SUBSIDIARY BORROWERS**:

71 STEVENSON ST SF LLC

750 HARRISON ST SF LLC

818 MISSION ST SF LLC

8590 NATIONAL BLVD LA LLC

8690 NATIONAL BLVD LA LLC

875 6TH AVE NYC LLC

88 KEARNY ST SF LLC

901 MARKET ST SF LLC

909 E STREET DC LLC

909 OCEAN FRONT WALK LA LLC

91 FIFTH AVE NYC LLC

BUSH 225 SF LLC

CORTLANDT WHITE NYC LLC

KKOIN, LLC

KNOTEL 1 WHITEHALL LLC

KNOTEL 102 MADISON LLC

KNOTEL 105 MADISON LLC

KNOTEL 109 STEVENSON LLC

KNOTEL 11 E 44TH LLC

KNOTEL 110 GREENE LLC

KNOTEL 110 WILLIAM LLC

KNOTEL 114 W 26TH LLC

KNOTEL 12 W 21ST ST LLC

KNOTEL 12 W 27TH ST LLC

By:_____
Name:  Amit Khanna
Title:    Assistant Secretary and General Counsel

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed.

**SUBSIDIARY BORROWERS**:

KNOTEL 121 2ND STREET LLC

KNOTEL 147 W 24TH LLC

KNOTEL 148 LAFAYETTE LLC

KNOTEL 150 POST LLC

KNOTEL 1500 BROADWAY LLC

KNOTEL 155 FIFTH AVE LLC

KNOTEL 156 FIFTH LLC

KNOTEL 16 W 22ND LLC

KNOTEL 160 PINE LLC

KNOTEL 17 W 20TH LLC

KNOTEL 180 HOWARD LLC

KNOTEL 200 W 41ST LLC

KNOTEL 2080 ADDISON LLC

KNOTEL 211 EAST 43 LLC

KNOTEL 213 W 35TH ST LLC

KNOTEL 220 W 19TH ST LLC

KNOTEL 221 PINE LLC

KNOTEL 224 W 30TH LLC

KNOTEL 229 W 43 LLC

KNOTEL 25 W 45TH LLC

KNOTEL 250 HUDSON LLC

KNOTEL 250 HUDSON ST LLC

KNOTEL 26 OFARRELL LLC

KNOTEL 26 W 17 LLC


By:_____
Name:  Amit Khanna
Title:    Assistant Secretary and General Counsel

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed.

**SUBSIDIARY BORROWERS**:

KNOTEL 261 MADISON LLC

KNOTEL 27 W 23RD ST LLC

KNOTEL 29 W 17TH LLC

KNOTEL 3 E 28TH LLC

KNOTEL 30 BROAD LLC

KNOTEL 30 WEST 26TH LLC

KNOTEL 307 FIFTH LLC

KNOTEL 31 W 27TH LLC

KNOTEL 321 11TH LLC

KNOTEL 340 BRANNAN LLC

KNOTEL 36 W 14TH LLC

KNOTEL 360 PAS LLC

KNOTEL 37 W 17TH LLC

KNOTEL 373 PAS LLC

KNOTEL 38 E 29TH LLC

KNOTEL 399 LAFAYETTE LLC

KNOTEL 40 EX LLC

KNOTEL 40 WOOSTER LLC

KNOTEL 400 MADISON LLC

KNOTEL 41 USW LLC

KNOTEL 41 W 25 LLC

KNOTEL 417 MONTGOMERY LLC

KNOTEL 419 PAS LLC

KNOTEL 43 W 24TH LLC

KNOTEL 443 PAS LLC

By:_____
Name: Amit Khanna
Title:   Assistant Secretary and General Counsel

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed.

**SUBSIDIARY BORROWERS**:

KNOTEL 475 PARK LLC

KNOTEL 49 DRUMM LLC

KNOTEL 5 HANOVER LLC

KNOTEL 521 BROADWAY LLC

 KNOTEL 530 BROADWAY LLC

KNOTEL 530 SEVENTH AVENUE LLC

KNOTEL 54 W 21ST LLC

KNOTEL 54 W 22ND LLC

KNOTEL 55 W 21ST LLC

KNOTEL 550 MONTGOMERY LLC

KNOTEL 551 FIFTH AVE LLC

KNOTEL 560 LEXINGTON LLC

KNOTEL 575 8TH AVE LLC

KNOTEL 580 FIFTH AVE NYC LLC

KNOTEL 580 MARKET LLC

KNOTEL 584 BROADWAY LLC

KNOTEL 5-9 USW LLC

KNOTEL 598 BROADWAY LLC

KNOTEL 6 W 48TH ST LLC

KNOTEL 600 TOWNSEND LLC

KNOTEL 61 BROADWAY LLC

KNOTEL 611 MISSION LLC

KNOTEL 615 SACRAMENTO LLC

KNOTEL 625 2ND LLC

KNOTEL 655 MADISON LLC


By:_____
Name: Amit Khanna
Title:    Assistant Secretary and General Counsel

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed.

**SUBSIDIARY BORROWERS**:

KNOTEL 695 AOA LLC

KNOTEL 701 SUTTER LLC

KNOTEL 72 MADISON LLC

KNOTEL 785 MARKET LLC

KNOTEL 80 EIGHTH AVE LLC

KNOTEL 814 MISSION LLC

KNOTEL 88 STEVENSON LLC

KNOTEL 90 JOHN LLC

KNOTEL 900 BROADWAY LLC

KNOTEL 972 MISSION LLC

KNOTEL BATTERY LLC

KNOTEL BLOCKCHAIN SERVICES LLC

KNOTEL FLOWERPOT LLC

KNOTEL GEOMETRY LLC

KNOTEL PLATFORM 2017 LLC

KNOTEL PRESIDENT LLC

KNOTEL PROPERTIES LLC

KNOTEL VARICK LLC

KNOTEL WILLIAM LLC

PACES FERRY ROAD ATL LLC

PINE STREET TENANT NY LLC

TENANT 660 MKT ST SF LLC


By:_____
Name:  Amit Khanna
Title:   Assistant Secretary and General Counsel

**DIP LENDER:**

DIGIATECH, LLC, a Delaware limited
liability company

By: _____

Name:

Title:

# EXHIBIT A

## COLLATERAL DESCRIPTION

As to each Borrower, (herein referred to as "Borrower" or "Debtor") all real and personal property whether presently existing or hereafter created or acquired, and wherever located, including, but not limited to:

(a)  All accounts (including health-care-insurance receivables), chattel paper (including tangible and electronic chattel paper), commercial tort claims, deposit accounts, documents (including negotiable documents), equipment (including all accessions and additions thereto), general intangibles (including payment intangibles and software), goods (including fixtures), instruments (including promissory notes), inventory (including all goods held for sale or lease or to be furnished under a contract of service, and including returns and repossessions), investment property (including securities and securities entitlements), letter of credit rights, money, and all of Debtor's books and records with respect to any of the foregoing, and the computers and equipment containing said books and records; and

(b)  any and all cash proceeds and/or noncash proceeds of any of the foregoing, including, without limitation, insurance proceeds, and all supporting obligations and the security therefor or for any right to payment.  All terms above have the meanings given to them in the California Uniform Commercial Code, as amended or supplemented from time to time.

Notwithstanding the foregoing provisions of this Exhibit A, Collateral shall not include any of the following:

(i)    more than 65% of the issued and outstanding equity interests owned by Borrower of any Foreign Subsidiary which shares entitle the holder thereof to vote for the election of directors or any other matter if the inclusion of more than sixty five percent (65%) of the issued and outstanding equity interests of such Foreign Subsidiary creates a present and existing adverse tax consequence to Borrower under the U.S. Internal Revenue Code that did not exist prior to the inclusion of such equity interests as Collateral; or (ii) any Equipment to the extent the granting of a security interest therein is prohibited by or would constitute a default under any agreement or document governing such Equipment (but only to the extent such prohibition is enforceable under applicable law, including Sections 9-406(d), 9-407(a) or 9-408(a) of Article 9 of the Code); provided that upon the termination or lapsing of any such prohibition, such property shall automatically be part of the Collateral; and provided further that the provisions of this paragraph shall in no case exclude from the Collateral any Accounts, proceeds of the disposition of any property, or general intangibles consisting of rights to payment, all of which shall at all times constitute Collateral; and provided further that any Equipment financed by Bank will at all times constitute Collateral.

**<u>Exhibit B</u>**

**DIP Budget**

**Knotel - DIP Case**

| | Filing Date | | | | | Closing Date (est.) |
|---|---|---|---|---|---|---|
| Week Number | 1 | 2 | 3 | 4 | 5 | 6 |
| End of Week | 2/7/2021 | 2/14/2021 | 2/21/2021 | 2/28/2021 | 3/7/2021 | 3/14/2021 |
| **Total North America** | | | | | | |
| | | | | | | |
| Starting Cash Balance | $ 621,317 | $ 9,958,813 | $ 6,047,235 | $ 4,142,971 | $ 3,659,148 | $ 2,103,396 |
| Ending Cash Balance | $ 9,958,813 | $ 6,047,235 | $ 4,142,971 | $ 3,659,148 | $ 2,103,396 | $ 100,000 |
| | | | | | | |
| DIP Funding (Excluding OID fee) | | | | | | $ 19,788,322 |
| DIP Funding (Including OID) | | | | | | $ 20,400,332 |
| | | | | | | |
| **Cash Inflows** | | | | | | |
| Customer Receipts | $ 1,340,875 | $ 176,252 | $ - | $ - | $ 2,410,962 | $ 176,252 |
| Financing | $ 15,000,000 | $ - | $ - | $ 4,788,322 | $ - | $ - |
| **Total Cash Inflows** | $ 16,340,875 | $ 176,252 | $ - | $ 4,788,322 | $ 2,410,962 | $ 176,252 |
| | | | | | | |
| **Cash Outflows** | | | | | | |
| Property Expenses | $ 1,405,549 | $ - | $ - | $ - | $ 1,258,852 | $ - |
| Personnel Expenditures | $ 15,000 | $ 1,035,000 | $ 125,000 | $ 985,000 | $ 15,000 | $ 775,000 |
| Professional Fees | $ 3,409,815 | $ 369,333 | $ 1,000,500 | $ 356,833 | $ 436,833 | $ 106,065 |
| Vendor Expenditures | $ 626,800 | $ 906,500 | $ 314,500 | $ 912,500 | $ 753,400 | $ 156,500 |
| Business Taxes | $ - | $ - | $ - | $ - | $ - | $ 203,000 |
| Expenditure Contingency | $ 545,716 | $ 231,083 | $ 144,000 | $ 225,433 | $ 246,409 | $ 124,057 |
| **Total Cash Outflows** | $ 6,002,881 | $ 2,541,917 | $ 1,584,000 | $ 2,479,767 | $ 2,710,494 | $ 1,364,622 |
| | | | | | | |
| **Non-US Subsidiary Funding** | $ (1,000,498) | $ (1,545,913) | $ (320,264) | $ (2,792,379) | $ (1,256,220) | $ (815,026) |
| | | | | | | |
| **Total Cash Inflow/Outflow** | $ 9,337,496 | $ (3,911,578) | $ (1,904,264) | $ (483,823) | $ (1,555,752) | $ (2,003,396) |